## COMMISSIONER OF INTERNAL REVENUE v. PATINO.

### No. 6149.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 16, 1950.

Decided Dec. 30, 1950.

Louise Foster, Special Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack and Helen Goodner, Special Assts. to the Atty. Gen., on the brief) for petitioner and cross respondent.

J. Harlin O'Connell, New York City (Aloysius F. Schaeffner, New York City, on the brief) for respondent and cross-petitioner.

Before PARKER, Chief Judge, and SO-PER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The petition and cross petition for review in this case raise two questions for decision, viz.: (1) whether the taxpayer was a resident or non-resident alien of the United States during the tax years 1944 and 1945 and (2) whether the cost basis of certain shares of stock sold by her in 1945 was the cost basis of her husband on the theory that she acquired the stock from him by gift in 1944 or the value of the stock in 1944 on the theory that she purchased it from him in that year for a valuable consideration.

Christina deBourbon Patino, respondent and cross-petitioner, was a national of Spain until 1931 when she married Antenor Patino, a national of Bolivia and then Second Secretary to the Bolivian Legation in Spain. Subsequent to the marriage and a short stay in Spain, the taxpayer and her husband moved to Paris upon the latter's appointment to the Bolivian Legation in France. While there two children were born to them, the first in 1932, and the second in 1935. In March, 1938 Antenor Patino was appointed Bolivian Minister to Great Britain, a position he occupied until May, 1945 when he was appointed Envoy Extraordinary and Minister Plenipotentiary, without Portfolio. During their years in Spain and France the taxpayer and her husband became a part of the diplomatic and social life of Europe and traveled extensively. When official duties took Patino to London, they retained their Paris home and continued their travels. In all these travels they came and went under the protection of diplomatic passports and visas.

In the summer and fall of 1940, to escape the German invasion, they and their children found their way through southern France, Spain and Portugal, and finally came to the United States where they occupied an apartment at the Plaza Hotel, New York City. The taxpayer brought no personal belongings to this country other than jewelry and clothes. She entered the country on October 25, 1940 under the protection of a Bolivian passport issued to her as the wife of the Bolivian minister to

Great Britain and under a diplomatic visa issued by the American Embassy at Madrid, Spain.

From October, 1940 through 1945 the taxpayer was at all times in the United States except for a trip to Mexico in July and August, 1941 to visit relatives, and a trip to Italy in September, 1941 to attend a sister's wedding from which she returned in December, 1941. During these trips she traveled under the same diplomatic passport and similar visas.

The Patino family occupied an apartment in the Plaza Hotel in New York from the time of their arrival in this country in 1940 until May, 1942 when marital difficulties developed. The taxpayer and her children then moved to an apartment in the Savoy Plaza Hotel in New York City and she instituted a suit for divorce in the Supreme Court of the State of New York. She continued to live at this hotel from that time and throughout the year 1945. The suit for a divorce, however, was discontinued and a property settlement and separation agreement was executed by the husband and wife in July, 1942. It provided for the payment by the husband of substantial sums annually to the wife for herself and the children, and it contained an agreement that the parties should live separately and apart in the same manner as if they were unmarried and that each party might engage in any occupation and reside in any place without the consent or approval of the other in all respects as if unmarried.

In March, 1943 the taxpayer filed a second suit in the Supreme Court of New York against her husband for an absolute divorce. She alleged as her basis for the jurisdiction of the court that she and her husband had been residents of the State of New York since October 26, 1940. This allegation was denied in the answer. The case did not come to trial but on July 16, 1944 the parties entered into a reconciliation agreement, resumed marital relations and lived together in the Savoy Plaza Hotel in New York City. Under the terms of the reconciliation agreement, the earlier separation agreement was cancelled, and the wife surrendered her right to receive the annual payments therein promised, and

Patino, on his part, paid his wife substantial sums and agreed to provide a home and support for his family. The reconciliation, however, was short lived. Patino abandoned his wife and family in May, 1945, left the country, and in the same year filed a suit against his wife for divorce in Paris. This proceeding has never been tried. In May, 1945 the taxpayer instituted suit in the Courts of New York against her husband, and in July, 1945 obtained a judgment by default in the sum of $500,000 in accordance with provisions in the reconciliation agreement with respect to abandonment by the husband without cause.

Upon these facts the taxpayer contends that she has never been a resident of this country and therefore is taxable only on the classes of income from sources within the United States described in Section 211(a) of the Internal Revenue Code, 26 U.S.C.A. § 211(a). The burden of her argument is that she was temporarily in this country in the tax years 1944 and 1945 as the wife of a Bolivian diplomat and as a war refugee, and that during all of her stay in the United States from 1940 to 1945 she and her husband were citizens of Bolivia living in transitory quarters in New York but domiciled in Paris where her husband had established a home for his family. She contends that she never acquired a domicile in New York because, as held in Stallforth v. Helvering, 62 App.D.C. 290, 77 F.2d 548, two things must occur in order to constitute a new domicile: (1) a residence in the new locality; and (2) an intention to remain there; and that there is no proof in this case to show such an intention on her part.

In considering this argument we need not stop to decide whether the domicile of the taxpayer during the period 1940 to 1945, including the tax years, was in New York or in Paris, because that question is not before us. We are not concerned with domicile but with residence; and it has been repeatedly held by decisions of this court that the concepts of domicile and residence are clearly distinguishable for purposes of federal taxation, and that residence alone is sufficient to subject a person to the tax imposed by the applicable

statutes See Commissioner v. Swent, 4 Cir., 155 F.2d 513; Myers v. Commissioner, 4 Cir., 180 F.2d 969; Commissioner v. Nubar, 4 Cir., 185 F.2d 584.

 The taxpayer contends further that the proof was insufficient to justify the finding of the Tax Court that she was a resident of New York during the crucial period. In passing upon this question we are aided by the definition of the term "residence" in Regulation 111 § 29.211-2 and by the rules of evidence to be used in determining a question of residence in the United States set out in Regulation 111 § 29.211-4[1] which are invoked by both parties to the controversy and have been approved as a correct exposition of the law by the decisions of this and other courts. Myers v. Commissioner, supra; Swenson v. Thomas, 5 Cir., 164 F.2d 783. Under the rules there set out it appears that one who lives in the United States and has no definite intention as to his length of stay is a resident; and his status is not altered by a mere floating intention to return to another country at some indefinite time in the future. Certainly this language is descriptive of the taxpayer's sojourn in the United States. She did not come as a transient for a definite purpose which, in its nature, might be promptly

accomplished, but to find an asylum from the terrors of a war of indefinite duration. Her long stay in New York from year to year despite her separation from her husband and her complete legal and financial freedom to go to other lands untroubled by the world conflict, proved beyond any reasonable doubt not only her physical presence in the United States but a deliberate intention to reside in this country so long as it might suit her convenience. She was living in New York in 1948 when the instant case was tried. So far as physical presence, length of stay and intention of the alien to remain in the United States for an indefinite period are concerned, the facts of the case are strikingly similar to those considered by this court in Commissioner v. Nubar, supra.

The second question for decision is the proper basis to be used in computing the capital gains tax on 2500 shares of stock in Patino Mines and Enterprises Consolidated, Inc. which the taxpayer sold in 1945. To answer this question it is necessary to describe more fully the two agreements entered into by the taxpayer and her husband, the first in July, 1942 and the second in July, 1944.

The first agreement provided that Patino would pay to his wife, the taxpayer,

---

1. Sec. 29.211-2. *Definition.* A "nonresident alien individual" means an individual—(a) Whose residence is not within the United States; and (b) Who is not a citizen of the United States.

An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

Sec. 29.211-4. *Proof of Residence of Alien.* * * *

An alien, by reason of his alienage, is presumed to be a non-resident alien. Such presumption may be overcome * * * by (a) proof that the alien has filed a declaration of his intention to become a citizen of the United States under the naturalization laws, (b) proof that the alien has filed Form 1078 or its equivalent, or (c) proof of acts and statements of an alien showing a definite intention to acquire residence in the United States or showing that his stay in the United States has been of such an extended nature as to constitute him a resident.

$24,000 a year for her sole use during her life so long as they continued to be married and not permanently separated or divorced. This amount was to be increased to $30,000 a year should they become permanently separated or divorced. The agreement provided further that Patino would pay all expenses of the children during their respective minorities; however, if the parties became permanently separated or divorced, Patino would pay to his wife an additional $20,000 a year from which she was to pay all expenses of the children during their respective minorities or until their respective marriage, whichever event should first occur. If any such event occurred as to one child, $10,000 of this $20,-000 could be allocated to her exclusive use. If any such event occurred as to both children, she would be paid a total of $50,000 a year for the remainder of her life for her own exclusive use. By the agreement the wife relinquished all other marital claims, statutory or otherwise, that she might have had against the husband's estate. The agreement provided that the payments should be enforcible against the husband's estate and that each of the parties had been fully advised by counsel of his or her selection of their legal rights. The payments were secured by 21,763 shares of stock of the Patino Mines and Enterprises Consolidated, Inc. In accordance with the agreement, Patino paid the taxpayer $30,000 for her support and maintenance and an additional $20,000 for the support, education and maintenance of the children from July 1, 1942 to July 10, 1944.

The agreement of July 10, 1944 cancelled and annulled the preceding agreement and made the following provisions: The husband agreed to provide a home for the wife and children and to support and maintain them. He agreed also to pay the wife the sum of $500,000 as follows: $100,000 in cash upon the signing of the agreement, $100,000 by delivery to her of 5,000 shares of the stock of the Patino Mines, and $300,-000 on January 1, 1945 with interest at 6 per cent. He also agreed that on July 7, 1951 he would pay her the further sum of $500,000 and that, if he should abandon her without just cause, said sum of $500,000 should be immediately due and payable and the wife agreed to forfeit this sum in the event that she abandoned her husband without cause. It was further agreed that if the wife should commence an action for divorce or separation in any court, she should not be entitled to alimony or counsel fees or any provision for support and maintenance, and in that event she waived and renounced all rights to share in her husband's property by way of dower, intestacy, will or otherwise, except that she would not forfeit the sum of $500,000 payable on July 7, 1951 unless she should have abandoned him without just cause prior to that date.

Other provisions of the agreement provided that the wife should have the custody of the children in the event that Patino abandoned her and that the wife's suit for divorce should be dismissed, and recited that each party to the agreement had taken legal advice from independent counsel of their own selection, who had explained to them their rights and obligations under the agreement.

In 1945 the taxpayer sold 2500 of the 5000 shares of the stock of Patino Mines which she acquired under the agreement, and the Commissioner, being of the opinion that the taxpayer acquired the stock by gift from her husband, determined that under Section 113(b) (2) of the Internal Revenue Code, 26 U.S.C.A. § 113(b) (2), the cost basis of the stock in her hands was $8 a share, which Patino had paid for it. The taxpayer contends that her cost basis was $20 a share, the value of the stock when she acquired it under the agreement of 1944, and the Tax Court so held.

The Commissioner contends that the taxpayer surrendered the right accorded to her under the 1942 agreement to receive $24,000 annually for life, with the contingent right to have the amount increased to $50,000 solely in consideration of Patino's promise in the 1944 agreement to provide a home and to support her and the children in the style to which they were accustomed; and that his additional promise in 1944 to pay her $900,000 in cash and $100,000 in stock was purely gratuitous and

therefore a gift. The Tax Court rejected this view. It held that the valuable rights acquired by the taxpayer in 1942 were surrendered in consideration of the payments to be made to her under the 1944 agreement; and that the transaction inured to the benefit of the husband by relieving him of his liabilities under the cancelled contract. The court further held that the stock was not a gift but was received for a valuable consideration since it was delivered to the taxpayer in satisfaction of a liability incurred by Patino to pay his wife $100,000. The court concluded that the cost basis of the stock to the taxpayer was $20 a share since it was accepted at this figure in the agreement and in the dealings between the parties in 1944 when each party had the benefit of the advice of independent counsel.

■ We are in accord with this finding. It is unreasonable to suppose, in view of the husband's instability, that the wife would give up her rights under the 1942 agreement, amounting ultimately to an income of $50,000 annually, in consideration of the unsupported promise of the husband to support his family. His record was against him, and the 1944 agreement on its face contemplated the possibility that he might repeat his past performances, as in fact he did. We think also that the Tax Court's finding that the stock was worth $20 a share at the time of its acquisition by the taxpayer is abundantly supported by the evidence. See the decision in Hall v. Commissioner, 9 T.C. 53.

The Commissioner, however, makes the additional contention that the Tax Court's ultimate holding should not be accepted, because the value of the rights under the 1942 agreement surrendered by the taxpayer have not been measured against the value of the rights acquired by her under the 1944 agreement; and that until this is done, it cannot be known whether the new rights were more valuable than the old, and if so, how much of the old value should be allocated to the stock. The answer to this argument is found in what has already been said. Plainly the taxpayer did not surrender her rights under the 1942 agreement in order to purchase her husband's

unsupported promise to support her. She had already found it necessary in 1942 to exact from him a formal contract expressing in definite figures the amount of his obligation in this respect and she required him to guarantee his agreement by the deposit of adequate security. In 1944 she gave up at the age of 31 the right to an annuity of $50,000 for life and also surrendered all financial claims against her husband in the event that she should sue him for a divorce. In exchange for the cancellation of these rights she received cash payments and promises of further payments aggregating in all the sum of one million dollars. The parties were dealing at the time at arms length with one another and came to the practical conclusion that the rights she received were equivalent in value to those which she surrendered.

The Commissioner says that his determination that the transfers to the wife under the 1944 agreement were gifts is presumptively correct, and that even if it be found that they were not entirely gratuitous, nevertheless the presumption is that they were partly so and hence the burden of proof is upon the taxpayer to show to the contrary by establishing the precise values of the rights she surrendered and the rights she received under the 1944 agreement; and he urges that the case should be remanded to the Tax Court with directions to take further proof, to ascertain the value of the annuity which the taxpayer received under the 1942 agreement.

■ It is, however, not essential that the value of the rights surrendered should be ascertained by reference to the mortality tables, for that is only one method of proof. Commissioner v. John C. Moore Corp., 2 Cir., 42 F.2d 186; Citizens Nat'l Bank v. Commissioner, 8 Cir., 122 F.2d 1011. It is entirely proper for parties to a contract to make their own estimates of values; and if they are dealing at arms length and there is no reason to question the bona fides of the transaction, their valuations may be accepted as correct. In Harris v. Commissioner, 71 S.Ct. 181, an exchange of properties between husband and wife in a divorce proceeding was under consideration and it was pointed out that

transactions of this kind are not made in the ordinary course of business; but the court said that if two partners on dissolution of a firm are able by agreement to unscramble their business interests in accordance with the Treasury Regulations[2] governing the taxation of exchanges of properties, no reason is apparent why husband and wife should be under a heavier handicap.

The judgment of the Tax Court is affirmed.

---

**2.** See Section 86.8 of Treasury Regulations 108 under the Gift Tax Statute which states in effect that when a sale, exchange or other transfer of property is made in the ordinary course of business (a transaction which is bona fide at arms length and free from any donative intent), it will be considered as made for an adequate and full consideration in money or money's worth. See also Commissioner v. Mesta, 3 Cir., 123 F.2d 986, 988, where it was said in respect to an exchange of property between husband and wife that it is a practical assumption when parties deal at arms length with one another that one who gives money or property for an unliquidated claim is getting his moneys worth.