*Decisions will be entered under Rule 50.*

ESTATE OF GORDON A. STOUFFER, DECEASED, MARK A. LOOFBOURROW, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63606. Filed September 19, 1958.

*Warren E. Hacker, Esq.,* and *Mark A. Loofbourrow, Esq.,* for the petitioner.

*William O. Allen, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in the income tax of petitioner's decedent for the year 1951 in the amount of $90,077.75, and in an amended answer alleged that the petitioner was liable for an additional deficiency of $233,418.48. The issues are (1) whether Gordon A. Stouffer, deceased, realized a gain when, in a divorce settlement with his wife, he surrendered an option that purportedly gave him the right to purchase certain shares of

stock in her possession; and (2) whether such gain, if realized, was long-term or short-term capital gain.

### FINDINGS OF FACT.

Gordon A. Stouffer filed his Federal income tax return for the calendar year 1951 with the then collector of internal revenue for the eighteenth district of Ohio, at Cleveland, Ohio. He died testate June 6, 1956, and Mark A. Loofbourrow is the qualified executor of his estate acting under authority of the Probate Court of Cuyahoga County, Ohio.

Some of the facts were stipulated and are found accordingly.

Ina Mae and Gordon A. Stouffer were first married on February 22, 1930. On May 24, 1934, upon petition of Ina Mae, this marriage was dissolved by an absolute divorce decree of the Common Pleas Court of Cuyahoga County, Ohio. Provisions of this decree relative to support payments to be made by Gordon for the support of their minor child were later the subject of motions to modify and orders thereon were appealed to the Court of Appeals for the Eighth District of Ohio and attempts made to appeal to the Supreme Court of Ohio. It was not until November 20, 1936, that this divorce litigation between the parties ended.

In the course of this litigation decedent broached the subject of remarriage to Ina Mae. Ina Mae insisted that if she did remarry, Gordon would have to provide her with some financial security such as giving her 40 or 50 thousand dollars. Gordon did not have such funds but he offered to transfer to her 2,000 shares of class B stock of the Stouffer Corporation (hereinafter sometimes called the company) upon which he was to have an option to purchase at $40,000, the then fair market value of such shares, and the irrevocable right to vote such shares. Accordingly, on March 6, 1937, Gordon transferred to Ina Mae 2,000 shares of class B stock of the company (which had an adjusted basis in his hands of $5 a share), under an instrument of assignment providing Ina Mae execute in irrevocable proxy in favor of Gordon to vote the stock and, on the same day, Ina Mae executed and delivered to Gordon the option agreement as follows:

### OPTION

Cleveland, Ohio
*Mar. 6, 1937.*

IN CONSIDERATION of One Dollar ($1.00), receipt of which is hereby acknowledged, I hereby give and grant to GORDON A. STOUFFER the right and option to purchase from me at any time prior to the first day of January, 1967, two thousand (2000) shares of the Class B. Common Stock of THE STOUFFER CORPORATION at Twenty Dollars ($20.00) per share, payable in cash. Should any stock dividends be paid on said stock, the price herein

stipulated shall include such stock dividends. All cash dividends shall belong to the undersigned unless and until said option shall have been exercised.

[s] Ina Mae Stouffer

The next day, March 7, 1937, Gordon and Ina Mae were remarried. During the years after 1937 and up until 1951 the company engaged in several transactions amounting to capital reorganizations involving stock dividends, stock splits, and changes in description and denomination of exchanged stock. In these transactions the 2,000 class B shares in the name of Ina Mae in 1937 became 20,000 shares of $2.50 par value of common stock which Ina Mae held in 1951.

In 1950 Ina Mae and Gordon again experienced marital difficulties and each retained counsel in anticipation of Ina Mae's suit for divorce. During the latter part of 1950 and the early part of 1951 counsel for Gordon and counsel for Ina Mae entered into negotiations for an agreement to be submitted to the court for approval in the event of a divorce. On May 10, 1951, Ina Mae and Gordon executed an agreement, the purpose of which was to settle and adjust the property rights of the parties. The agreement provided, among other things, that:

4. Gordon agrees that, upon the entry of such decree of divorce, any interest which he, or any other person, might, but for this agreement, have in any shares of stock of The Stouffer Corporation now registered in the name of Ina Mae shall forthwith terminate, and Ina Mae shall continue to own, hold and vote such stock free of any claim by Gordon or anyone claiming by, through, or under him.

On May 11, 1951, Ina Mae filed petition for absolute divorce in the Court of Common Pleas of Cuyahoga County and on June 27, 1951, the court entered a decree of divorce in that case. The decree incorporated the agreement entered into by the parties under the date of May 10, 1951.

The fair market value of the 20,000 shares of $2.50-par-value common stock in the company held by Ina Mae on June 27, 1951, was $20 a share.

OPINION.

It is the contention of the respondent that upon the surrender of the option in the divorce settlement and decree, in return for the surrender by Ina Mae of her rights to support and maintenance and to a share in Gordon's property at his death, Gordon realized a taxable gain in the amount of $359,999 (the value of the option agreement, $360,000, less $1 consideration recited therein). Petitioner resists this contention on three grounds: (1) That no gain could be realized under a transaction of this type; (2) that the option had no determinable fair market value on June 27, 1951, the date of the divorce decree; and (3) that the stock subject to the option had a

value less than $400,000 on June 27, 1951, thus affecting the amount of the gain determined by the respondent.

Petitioner's argument on the first point is that the transaction was merely a division of property between Gordon and his wife and Gordon cannot be held to have realized taxable gain by thus giving up a substantial portion of his property and also it would be impossible to value what Gordon received for his release of the option. The argument on the latter point is that Gordon received for his option release the release of Ina Mae's rights to support and maintenance and the right to share in his property at his death and these are rights that are impossible to value.

In *Commissioner* v. *Mesta*, 123 F. 2d 986 (C. A. 3), reversing 42 B. T. A. 933, the taxpayer and his wife reached an agreement, prior to a decree of divorce, in which the taxpayer contracted to give his wife shares of stock and other consideration in lieu of a legal obligation to support her. The obligation imposed upon the taxpayer by the contract was substituted for the obligation imposed upon him by the State law and, therefore, when he delivered the stock to his wife, it was in partial discharge of his obligation under the contract. The court said:

There is no doubt that Mesta achieved a capital gain. He paid $7,574.56 for stock which when disposed of in discharge of his obligation to Mrs. Mesta was worth $156,975. Had the stock not been transferred, he would not have achieved a taxable gain because the economic gain would have been unrealized. The disposition of the stock was the taxable event in the case at bar. This is so even though Mesta may not have received payment in money or property from Mrs. Mesta. * * *

Section 111 (b) of the Internal Revenue Code of 1939 provides that the "amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Petitioner argues that the rights given up by Ina Mae were unliquidated and not susceptible of valuation and, therefore, had no "fair market value" within section 111 (b). This same argument was made in the *Mesta* case, and the Court of Appeals, in rejecting this contention, said:

We think there can be no doubt that Congress intended a measurement of values under the circumstances indicated by the statutes quoted, notwithstanding difficulties in determining those values. In the case at bar there is a gain in the value of the stock and an event whereby that gain was realized. The fair market value of the property or benefit received by Mesta for the stock may be difficult to ascertain, but in the absence of any other value being shown we think that it is proper to take fair market value. In the case at bar the amount of the taxpayer's obligation to his wife was fixed in part in terms of stock by the parties themselves who really dealt at arm's length with one another. It was so found by the Commissioner and the taxpayer has not rebutted the presumption that the Commissioner's ruling is correct. We think that we may

make the practical assumption that a man who spends money or gives property of a fixed value for an unliquidated claim is getting his money's worth.

The only difference between the *Mesta* case and the instant case is that here Gordon surrendered an option to purchase stock rather than the stock itself. We do not think this difference significant. An option, such as is here involved, can have a fair market value and this value is established by proof showing the property covered by it was worth a certain sum in excess of the option price. *Robert Brunton Studios, Inc.*, 15 B. T. A. 727.

It is true that in the *Mesta* case the property settlement agreement was not mentioned in the divorce decree while here it was. Any argument that this case is distinguishable from the *Mesta* case, on the ground that the decree operates as a division of property between the parties and hence husband's property was not used to discharge his obligations, is without substance. *Commissioner* v. *Halliwell*, 131 F. 2d 642 (C. A. 2), certiorari denied 319 U. S. 741, reversing 44 B. T. A. 740.

Petitioner's specific argument here is that this option was legally open to dispute as an option to buy 20,000 shares of company stock and therefore incapable of valuation. We do not need to pass on the validity of the option. We do not understand that petitioner argues it was invalid. The argument is that a court of competent jurisdiction might hold it unenforcible in 1951 since it purported to cover 2,000 shares of class B stock in the company and this stock was not in existence in 1951 and that there was a dispute between the parties as to the enforcibility of the option agreement.

We have not detailed all of the evidence of the stock splits and capital changes that occurred in the years between 1937 and 1951 but it fairly appears from the record that the 2,000 class B stock named in the option was the antecedent stock for the 20,000 shares held by Ina Mae in 1951. But the most significant fact is that the great weight of the evidence establishes that there was no dispute between the parties as to the validity and enforcibility of the option contract as covering the 20,000 shares in 1951. It is admitted that Gordon was asserting that it covered the 20,000 shares and the weight of the evidence was that Ina Mae agreed that it covered the 20,000 shares.

All of their acts showed that they interpreted the option contract as covering the 20,000 shares. Gordon voted the stock long after it ceased to be class B common stock. If the option contract be considered ambiguous, this record leaves no doubt that the parties to it regarded it as giving Gordon the right to purchase the 20,000 shares of $2.50-par-value common stock of the corporation in 1951. The interpretation given to the contract by the parties to it will govern. Restatement, Contracts sec. 235 (e). We hold taxable gain to Gordon resulted from his relinquishment of the option.

The amount of gain is the fair market value of the property or benefit received by Gordon for the release of the option which had the effect of transferring 20,000 shares of stock to Ina Mae. As was stated in the *Mesta* case, the obligations of the husband to support and maintain the wife and her right to a portion of his property when he died would be difficult to value. There the court took the practical approach and, on the "assumption that a man who spends money or gives property of a fixed value for an unliquidated claim is getting his money's worth," the court turned to the fair market value of the stock to measure the value of the benefit received by the husband. But it must be remembered it is the value of the husband's obligations to support and maintain the wife and her right to share in his estate when he dies, that is to measure the gain. We only turn here to the value of the option to purchase the stock (and therefore the value of the stock) because that was the medium of payment used by the husband and accepted by the wife for the wife's relinquishment of his obligations to her. This means that if the parties placed a valuation on the stock and dealt in the stock at a valuation they fixed, the measure of Ina Mae's rights which were relinquished would be measured by that fixed value. *Aleda N. Hall*, 9 T. C. 53; *Christina de Bourbon Patino*, 13 T. C. 816, affd. 186 F. 2d 962.

It is quite evident from all the evidence that during the prolonged negotiations leading to the divorce decree in 1951 the attorneys for both Ina Mae and Gordon treated the option held by Gordon as an asset with a value of $360,000. In a schedule of assets submitted by Gordon's attorneys to Ina Mae's attorneys the option was shown as having a value of $360,000. (Stock of $400,000 less $40,000 option price.) Ina Mae accepted this value as a basis for entering into the separation agreement. She undeniably had valuable marital and other property rights as the wife of Gordon and she was evidently convinced that in obtaining the release of the option, with its agreed upon value of $360,000, she was getting a fair equivalent of a portion of her marital and other property rights. She accepted this release in exchange for such rights. This was deemed fair by counsel for both sides.

In the *Patino* case, *supra*, the issue was the proper basis to be used by the taxpayer-wife for certain shares of stock received by her from her husband under an agreement in which she renounced her marital right in her husband's property. The Commissioner, who argued that the transfer of stock to her was a gift, went on to argue that even if the transfer were not entirely gratuitous, the presumption was that it was partly so and that therefore the burden of proof was on the taxpayer-wife to show to the contrary by establishing the precise value of the rights she surrendered and the rights she received.

The Court of Appeals for the Second Circuit, in rejecting this argument, said:

It is entirely proper for parties to a contract to make their own estimates of values; and if they are dealing at arms length and there is no reason to question the bona fides of the transaction, their valuations may be accepted as correct. * * *

Under the record here and the authority of the *Hall* and *Patino* cases we are of the opinion that petitioner's gain was $360,000, as determined by respondent, less the $1 recited in the option agreement.

Even if we approach the problem by an attempt to determine the fair market value of the stock on the date of the settlement agreement, as was done in the *Mesta* case, the result is the same. Petitioner alleged the stock in question had a fair market value on June 27, 1951, of $291,000. The figure $360,000 was computed by giving each of the 20,000 shares of Stouffer common stock subject to the option a fair market value of $20, or a total of $400,000, and then subtracting $40,000, which was the amount at which the option would be exercised. There is independent evidence in the record to support this valuation. The Stouffer common stock was not listed on any exchange but it was sold and quoted in over-the-counter market in Cleveland during 1951 as follows:

| Date | Sales per share | Quotation per share Bid | Asked | Date | Sales per share | Quotation per share Bid | Asked |
|---|---|---|---|---|---|---|---|
| 1951 | | | | 1951 | | | |
| March 2 | 20 | | | May 25 | 19½ | | |
| March 2 | 20¼ | | | June 1 | 20 | | |
| April 25 | 19¾ | | | June 11 | 19¾ | | |
| April 30 | | 19½ | 20½ | July 20 | | 18 | 20 |
| May 10 | | 19 | 20½ | July 27 | | 18 | 19 |
| May 11 | | 19 | 20½ | September 17 | 20 | | |

Moreover, there is evidence that the Stouffer Corporation was definitely a growth corporation. Its sales and earnings record over the years was impressive and it showed clear signs of improving. Petitioner argues that the market for Stouffer stock in 1951 was thin and that any attempt to place 20,000 shares of such stock on the market would have a depressing effect on the market price. We are not persuaded that such would be the case. There was testimony by two expert witnesses of the petitioner to the effect that 20,000 shares of stock could have been disposed of in the 1951 market without any appreciable depressing effect on the market price.

Considering all of the evidence as to valuation we are of the opinion that $20 a share would be the fair market value of the stock in question.

In the notice of deficiency respondent determined that the income realized by Gordon in connection with the divorce decree "represents a long-term capital gain under the provisions of section 117 of the

Internal Revenue Code of 1939." By an amended answer filed a few months before trial respondent changed his position to increase the proposed deficiency from $90,077.75 to $323,096.23 on the ground that the alleged gain "constitutes a gain attributable to the failure to exercise an option to buy property, which under section 117 (g) (2) of the Internal Revenue Code of 1939 is considered as a short-term capital gain, rather than a long-term capital gain."

Section 117 (g) (2) provides that "gains or losses attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains or losses."

There is no merit in respondent's position. Here the gain was not "attributable" to the failure to exercise. It was "attributable" to the court decree that terminated and ended the option. The case is distinguishable from *Seth M. Milliken*, 15 T. C. 243, where the optionee voluntarily allowed the option to expire. Here this option had 16 more years to run in 1951 when it was terminated by the court decree. That it is the decree and not the predivorce agreement that fixes the rights and obligations of the parties, see *Harris v. Commissioner*, 340 U. S. 106; *Commissioner v. Maresi*, 156 F. 2d 929.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: I dissent for the reasons stated by the late Judge Mellott in *L. W. Mesta*, 42 B. T. A. 933.

TIETJENS, *J.*, agrees with this dissent.

---

PIERCE, *J.*, dissenting: I would have held, for the reasons stated in *L. W. Mesta*, 42 B. T. A. 933, which was reversed by divided court in 123 F. 2d 986, that the husband's relinquishment and termination of his stock option, in the divorce settlement with his wife, did not for income tax purposes give rise to taxable gain.

TIETJENS, *J.*, agrees with this dissent.