BLACK INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Black Industries, Inc. v. Commissioner
Docket No. 5286-76.
United States Tax Court
T.C. Memo 1979-61; 1979 Tax Ct. Memo LEXIS 465; 38 T.C.M. (CCH) 242; T.C.M. (RIA) 79061; February 22, 1979, Filed *465 P purchased the assets of X corporation. P allocated the entire price of such assets to tangible assets and subsequently claimed depreciation deductions based on the allocation. The Commissioner challenged such allocation, claiming that a portion of the purchase price was allocable to going-concern value. Held, the fair market value of the tangible assets determined; part of the purchase price was allocable to going-concern value. Thomas J. Stevens, for the petitioner. William S. Patterson and Frank C. McClanahan III, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF *466 FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioner's Federal income taxes as follows: Taxable Year Ended September 30
Deficiency
1972
$ 4,800.79
1973
28,387.39
The parties have settled or conceded certain issues. The issue for decision is whether the price paid for the purchase of business assets is properly allocable to the purchase of tangible assets or whether a part of such price is allocable to the purchase of an intangible asset, going-concern value. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Black Industries, Inc. (Black), is a North Carolina corporation which had its principal place of business in Durham, N.C., at the time it filed its petition in this case. It filed its income tax returns on the basis of a taxable year ending September 30, and we shall identify its taxable year by the calendar year in which it ended. Black timely filed its Federal corporate income tax returns for 1972 and 1973 with the Southeast Service Center, Memphis, Tenn.
Black was incorporated in 1954 and at such time was engaged primarily in the business of *467 trimming trees for power and telephone companies. Over the years, Black gradually expanded its business to include aerial work (i.e., erecting poles and stringing wires) and underground work (i.e., burying telephone and power lines). At the time of trial, Black was a service organization primarily engaged in the installation of underground telephone cable. The type of equipment used to install underground cable depends on the location of the cable route. If the cable is laid along the shoulder of a paved road, rubbertired equipment must be used to prevent damage to the highway surface. However, if the cable is installed along a dirt road or private right-of-way, steel-treaded crawlers supply the necessary traction and pulling power. The cable is placed 24 to 42 inches below the earth's surface by either a static or vibratory cable plow attached to the rear of a pulling unit. In many cases, plowing conditions require two pulling units be used in tandem. A fleet of support vehicles is required to carry the cable and to provide for refueling, relocating, and maintaining the equipment. During the early 1970's, utility companies began to shift to underground cables. At the *468 same time, changes in State laws and engineering techniques radically changed the kind of equipment necessary to lay cable. Some States began regulating how close to the road cable could be laid, and others required plowing to be done on utility strips. In addition, because of the number of cables already buried in certain areas, plowing techniques and machinery had to be developed so that existing underground cables would not be disturbed when an additional cable was being installed. Because of these changes, Black was continuously in the market for good equipment specially outfitted for the cable-plowing business. The petitioner is a publicly held corporation. Its stock was first publicly offered on August 5, 1971, at $ 6 per share, on the over-the-counter market. On July 31, 1972, there were 1,141,018 shares of Black stock outstanding. In 1972, Craig Black, who was the chief executive officer of the petitioner, owned approximately 600,000 shares of Black's restricted stock. Superior Excavating Corporation of Virginia, Inc. (Superior), was a Virginia corporation with its offices in Charlottesville, Va. Superior was incorporated in 1968 and was engaged primarily in excavating *469 work until 1971. During such year, Harrison Nesbit, a successful insurance man, was informed by various sources that telephone and utility cables were going to be laid under-ground in the foreseeable future. With this information, he invested substantial amounts in Superior, which had made the decision to expand its operations to include the cable-plowing business. Eventually, Superior had enough equipment and employees to outfit six cable-plowing crews. Through mid-1971, Mr. Nesbit's brother, who founded Superior, managed the cable-plowing business. However, since Superior suffered losses of over $ 100,000 during such period, Mr. Nesbit assumed control of the day-to-day operations of Superior for about 2 months in the latter part of 1971. Thereafter, Mr. Nesbit hired an experienced manager to run the daily business of Superior, and Mr. Nesbit's brother, who was an excellent mechanic, took charge of maintenance of the equipment. During 1972, Mr. Nesbit decided he wanted to devote more time to his insurance business. Though he recognized that Superior's initial losses were largely attributable to start-up costs and that Superior was finally at the break-even point, he concluded *470 that he had neither the time nor the mechanical knowledge or ability to make Superior a successful business. Accordingly, he decided to sell Superior's assets and to liquidate Superior. After investigating various other possibilities, Mr. Nesbit contacted Mr. Black. They conducted extensive negotiations, during the course of which Mr. Nesbit was assured by an appraiser that Superior's equipment was "better than new," and Mr. Black inspected and observed the equipment in operation on several occasions and determined that it was already adapted to the plowing business, was on the average less than one year old, and was in good operating condition. In time, Black and Superior entered into an agreement dated July 27, 1972, pursuant to which Black acquired substantially all of Superior's assets in exchange for a mutually agreed upon consideration of $ 614,408.95, comprised of $ 14,000 in cash, 19,000 shares of Black unregistered common stock, and the assumption by Black of $ 472,158.95 of Superior's liabilities. The transaction was closed on July 31, 1972. The stock was transferred into escrow for a period of one year to guarantee Superior's performance under the agreement. The *471 parties arrived at the $ 614,408.95 purchase price by valuing the stock at $ 6.75 per share, which amount was the mean of the bid and asked prices of the publicly traded Black stock on July 31, 1972. Because of undisclosed property taxes of $ 4,459.28 and an overstatement of $ 4,725.90 in work in process, 1,334 shares of the escrowed stock, valued at $ 6.75 per share, were cancelled. Additionally, Black reported the purchase price as $ 614,408.95 on an information report it filed with the Securities and Exchange Commission (SEC). The purchase price was specifically allocated by the parties to Superior's assets on an itemized basis, and the Commissioner, in his notice of deficiency, reallocated the purchase price as follows: Commissioner's Assets
P's Allocation
Allocation
Accounts
receivable
$ 68,759.21
$ 68,759.21
Work in process
42,251.73
42,251.73
Parts
21,300.00
21,300.00
Equipment
377,614.49
262,892.00
Trucks
66,983.52
31,200.00
Land
12,500.00
12,500.00
Building
25,000.00
2,940.00
Going concern
172,566.01
Total
$ 614,408.95
$ 614,408.95
The following chart summarizes the equipment purchased by Black, the date Superior *472 acquired it, its cost, Superior's adjusted basis in such equipment as of the date of sale, the valuation of the equipment, and the allocation of the purchase price to it by the petitioner and the Commissioner: [SEE TABLE IN ORIGINAL] Many of the trucks acquired by Black from Superior had been significantly modified by Superior by adding some or all of the following accessories: bodies, hitches, winches, water cooler racks, tow hooks, sign racks, tool boxes, and an electric brake for the trailer. Summarized below is the relevant information concerning such trucks: [SEE TABLE IN ORIGINAL] Under Virginia law, a 4-percent sales tax is imposed on the sale by a dealer of equipment and trucks similar to those Black acquired from Superior. However, this tax does not apply to a subsequent sale by a nondealer if the tax was originally paid by such nondealer. The land Black purchased from Superior was a 2.07-acre parcel located in Albemarle County, Va., just out-side of Charlottesville, Va., at the junction of U.S. Route 250 and State Route 794. The property was triangular in shape and partially enclosed by a 7-foot chain link fence. The property was zoned for manufacturing *473 uses, and under a "grandfather clause" in the zoning ordinance, it retained such classification as long as it was continuously used for a manufacturing purpose. Most of the surrounding area was not zoned for manufacturing uses, and it was very difficult to have property rezoned or to receive a variance. The land was improved with a two-bay service station which contained an office and toilet facilities. The service station had two tanks and electric gas pumps. The land was graded and graveled. The building enclosed 1,050 square feet. The building was completely serviceable as a gas station, though it was not used as a retail gas outlet. In prior years, it had been operated as a successful gas station because U.S. Route 250 was the primary route between Richmond and Charlottesville. However, with the construction of I-64, most of the traffic bypassed this location. Superior purchased the property in November 1971 and erected the fence on the perimeter of the property in January 1972. Its cost basis in the land was $ 10,374.18, and its cost basis in the improvements on the land was $ 13,943.60. In 1972, Superior used the property as a storage area and to refuel its equipment. *474 In the spring of 1972, Superior retained an independent appraiser to value the property in light of its manufacturing zoning. He valued the land at $ 22,500 (90,000 square feet at 25 cents per square foot), and he valued the building at $ 15,000. On its tax return for the taxable year ended November 30, 1972, [1]Superior allocated $ 31,438.20 of the purchase price to the land and building. Following the sale to Black, Superior distributed all of its assets to its shareholders in a liquidating distribution under the provisions of section 337 of the Internal Revenue Code of 1954. [2] Thereafter, except to wind up its affairs, Superior discontinued doing business and was subsequently dissolved. By the acquisition of Superior's assets, the petitioner did not acquire a new product line. In addition, Black did not purchase Superior's corporate name, nor did it acquire *475 a convenant not to compete. Superior had net operating losses of $ 11,901.47 in 1969, $ 27,067.62 in 1970, and $ 81,259.47 in 1971, for a total net operating loss of $ 120,228.56 at the end of its 1972 taxable year. Superior had no exclusive or long-term contracts, and all of its contracts could be cancelled on 30 days' notice. Superior had no good will. Black had approximately 600 employees just prior to purchasing Superior's assets. After the purchase, though the petitioner was not contractually bound to do so, it hired 44 of Superior's employees. Of that total, 32 were still employed by Black at the end of 1972, 18 at the end of 1973, and 11 at the end of 1974 and at the time of trial. It has been the petitioner's experience that there is a high turnover in employees in its business. Black's principal customers are public utility and telephone companies. It conducts its business solely in the southeastern part of the United States, including Virginia. Superior conducted its business within a 35-mile radius of Charlottesville, Va., and its sole cable-plowing customer was Virginia Telephone and Telegraph Co. (V.T. & T), which was also a customer of Black. Below is a *476 summary of the payments made by V. T. & T. to Black and Superior from October 1970 through September 1973: Payments to
Payments to Date
Black
Superior
Oct. 1970 $ 31,074.45
Nov. 1970
2,468.62
Dec. 1970
38,866.12 $ 1,393.15
Jan. 1971
Feb. 1971
6,939.16
March 1971
15,444.75
April 1971
12,887.05
May 1971
29,250.84
2,492.06
June 1971
29,236.47
15,180.25
July 1971
34,437.27
7,691.18
Aug. 1971
28,544.49
40,889.25
Sept. 1971
31,026.07
15,511.63
Oct. 1971
27,035.38
27,789.80
Nov. 1971
21,042.22
56,376.12
Dec. 1971
46,469.51
86,308.22
Jan. 1972
16,718.97
19,781.15
Feb. 1972
20,000.43
49,092.67
March 1972
40,580.99
29,518.75
April 1972
42,457.48
27,857.42
May 1972
32,616.03
51,975.37
June 1972
27,167.28
97,184.66
July 1972
17,931.60
20,011.61
Aug. 1972
61,110.38
64,150.31
Sept. 1972
127,064.85
Oct. 1972
166,772.33
Nov. 1972
95,268.84
Dec. 1972
123,248.68
Jan. 1973
53,042.40
Feb. 1973
42,493.92
March 1973
73,845.81
April 1973
63,452.59
May 1973
87,253.22
June 1973
82,269.94
July 1973
66,161.00
Aug. 1973
73,858.64
Sept. 1973
59,606.09
Total
$ 1,727,643.87
$ 613,203.60
Excluding *477 Superior's assets, Black made the following additions to its tangible assets during the periods indicated: Taxable Year Ended September 30
Amount
1969
$ 353,924
1970
524,558
1971
569,695
1972
962,308
1973
679,485
1974
537,533
1975
77,117
In addition, many of the petitioner's attempts to acquire additional equipment proved unsuccessful.
For its 1972 and 1973 taxable years, Black reported, in its 1973 annual report, revenues of $ 129,351 and $ 614,079, respectively, as attributable to the acquisition of Superior.In such report, Black characterized the acquisition of Superior as "a natural tie-in to future goals" because it provided Black with "the opportunity to acquire trained men and equipment that were already working and were located in an area where we wanted to do more work." On its Federal income tax returns for 1972 and 1973, the petitioner claimed deductions for depreciation of the equipment, trucks, and building purchased from Superior based on the values which it allocated to such assets. In his notice of deficiency, the Commissioner determined that a portion of such values was allocable to an intangible, nondepreciable asset and reduced *478 the allowable depreciation accordingly. Shortly before the trial of this case, the Commissioner amended his answer to allege that the total purchase price and the amounts allocated to going-concern value should be decreased. At trial, the petitioner claimed that it had intended to allocate $ 22,500 to the land and $ 15,000 to the building acquired from Superior. OPINION At the outset, we must dispose of several preliminary questions: (1) What was the total consideration Black paid Superior and who has the burden of proof with respect to such issue; and (2) who bears the burden of proving the remaining issues in this case. From the beginning, the petitioner has maintained that it paid Superior $ 614,408.95. In his notice of deficiency, the Commissioner determined "that the purchase price of $ 614,408.95 you paid to Superior * * * for various assets should be allocated" so that $ 172,566.01 is allocated to "other" assets. Just prior to trial, the Commissioner moved to amend his answer to allege that the purchase price paid by the petitioner was in fact less than $ 614,408.95. Over the petitioner's objection, we granted such motion. Now the petitioner argues that the allegations *479 in the amendment to answer raise new issues and that, therefore, the burden of proof as to all issues in this case is shifted to the Commissioner. In the alternative, the petitioner argues that the Commissioner shoulders the burden of proving the purchase price was less than $ 614,408.95. As a general proposition, it is firmly established that the petitioner bears the burden of proving that the Commissioner's deficiency determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). However, where the Commissioner pleads in his answer "new matter, increases in deficiency, and affirmative defenses," he bears the burden of proving such allegations. Rule 142(a). It is generally held that where the deficiency notice pinpoints the bases of the Commissioner's deficiency determination, any subsequent departure from such bases which requires the presentation of different evidence constitutes new matter which the Commissioner bears the burden of proving. Estate of Emerson v. Commissioner,67 T.C. 612, 620 (1977); *480 Sanderling, Inc. v. Commissioner,66 T.C. 743, 758 (1976), supp. opinion 67 T.C. 176 (1976), affd. 571 F. 2d 174 (3d Cir. 1978); Estate of Falese v. Commissioner,58 T.C. 895, 899 (1972); McSpadden v. Commissioner,50 T.C. 478, 493 (1968); Sorin v. Commissioner,29 T.C. 959 (1958), affd. per curiam 271 F. 2d 741 (2d Cir. 1959). Here, it is clear that the burden of proof remains with the petitioner regarding the issues raised in the deficiency notice. However, as to whether the petitioner actually paid $ 614,408.95 to Superior for its assets, it is our view that such issue is new matter which requires different proof than that required to disprove the deficiency as determined in the deficiency notice. Accordingly, we hold that the petitioner retains the burden of proof on all issues except that the Commissioner has the burden of proving that the purchase price of the assets was less than $ 614,408.95. In addition, we hold that the Commissioner has failed to carry his burden. The dispute over the value of the Black stock transferred to Superior results from a difference *481 of opinion as to the effect to be given to the fact that such stock was not registered. The Commissioner presented the testimony of an expert witness, who expressed the view that, because of the lack of registration of the stock, its value did not exceed $ 5.67 per share. However, Mr. Black and Mr. Nesbit testified that the purchase price was mutually agreed upon, as was the value of the stock, and resulted from hard bargaining. Agreements reached as a result of arm's length bargaining between parties with adverse legal interests are generally respected by the courts unless there is a reason to question the bona fides of the transaction. Commissioner v. Patino,186 F. 2d 962, 967 (9th Cir. 1950), affg. 13 T.C. 816 (1949); Evans v. Rothensies,114 F. 2d 958, 962 (3d Cir. 1940); 212 Corp. v. Commissioner,70 T.C. 788, 800 (1978). Because Superior liquidated pursuant to section 337, and because of the consequence to its shareholders under section 331, Superior had an interest in holding down the stated value of the Black stock which it acquired. Such interest was adverse to Black's interest in inflating the stated *482 value for depreciation purposes. In addition, the petitioner also reported such amount as the purchase price to the SEC in conformity with certain statutory reporting requirements. Moreover, after a dispute subsequently arose over unpaid taxes and overstated work in process, the parties resolved their differences by adhering to their initially agreed upon value of the stock. They cancelled sufficient shares at $ 6.75 per share to eliminate the liabilities. On this record, we are not convinced that the restricted Black stock acquired by Superior was worth less than the agreed-upon value.
Having disposed of those preliminary matters, now we must decide the fair market value of the tangible assets acquired by Black from Superior so that Black can compute its cost basis in such assets and ascertain the depreciation deduction to which it is entitled. The parties agree that the portion of the purchase price allocated to accounts receivable, work in process, and parts is reasonable. They disagree over what portions of the remaining purchase price should be allocated to equipment, trucks, real estate, and going-concern value, and over whether the residual method of valuation should be *483 used in this case. The Commissioner argues that the residual method of valuation should be used in this case, and using such method, he allocates a significant portion of the purchase price to going-concern value. The residual method of valuation is an indirect method of valuing intangible assets. Jack Daniel Distillery v. United States,379 F. 2d 569, 579 (Ct. Cl. 1967). Such method involves a three-step process. First, the total consideration paid for all of the assets, both tangible and intangible, is determined. Next, the tangible assets are valued. Finally, the value of the tangible assets is subtracted from the total consideration paid, and the remainder or residual value is allocated to intangible assets. Jack Daniel Distillery v. United States,supra at 579; R. M. Smith, Inc. v. Commissioner,69 T.C. 317, 320-323, 339-340 (1977); Florida Publishing Co. v. Commissioner,64 T.C. 269, 280 (1975), affd. in an unpublished opinion 552 F. 2d 367 (5th Cir. 1977). The residual method of valuation *484 is frequently resorted to when intangible assets are involved. The petitioner has cited us to no authority disapproving of such method under circumstances similar to those in this case, nor has it demonstrated that such method is arbitrary or unreasonable in this case. The petitioner argues that this Court should observe the allocation agreed to by it and Superior, and that in any event, going-concern value does not inhere in the type of assets it acquired from Superior. We disagree. As previously stated, the Court will not disturb the kind of allocation involved in this case where parties with adverse legal interests are dealing at arm's length and where there is no reason to question the bona fides of the transaction. See 212 Corp. v. Commissioner,supra. While Black's and Superior's interests were adverse with respect to the stated value of the total consideration paid, their interests were not, as a practical matter, adverse with respect to the allocation of the purchase price because Superior did not recognize gain under section 337 and because any excess depreciation recapture would be offset by the net operating loss. Accordingly, we are justified in carefully *485 scrutinizing the merits of the allocation. In addition, we believe going-concern value was one of the assets Black acquired from Superior. Going-concern value is the additional element of value which attaches to property because of its existence as an integral part of a going concern. VGS Corp. v. Commissioner,68 T.C. 563, 591 (1977); Conestoga Transportation Co. v. Commissioner,17 T.C. 506, 514 (1951). The petitioner argues that going-concern value can exist only in connection with certain types of tangible assets. However, any assemblage of assets into a functioning, on-going business is capable of giving rise to going-concern value. As we stated in VGS Corp. v. Commissioner: the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership, is a vital part of the value of a going concern. Winn-Dixie Montgomery, Inc. v. United States,444 F. 2d 677, 685 (5th Cir. 1971); Computing & Software, Inc. v. Commissioner,64 T.C. 223, 235 (1975). It is, however, intangible and hence nondepreciable. Therefore, that portion of the lump-sum *486 purchase price attributable to going-concern value must be excluded from the basis of the depreciable assets. Northern Natural Gas Co. v. United States,470 F. 2d 1107, 1110 (8th Cir. 1973), cert. denied 412 U.S. 939 (1975); Computing & Software, Inc. v. Commissioner,supra. [68 T.C. at 592.] The dramatic rise in payments from V. T. & T. to Black immediately following its acquisition of Superior's assets clearly indicates that Black acquired Superior's business as well as its tangible assets. Yet, we need not rely on mere inferences to determine whether going-concern value was present. By the petitioner's own admission, its purchase of Superior enabled it to acquire, in a market where it wished to expand its operation, specially outfitted equipment, employees trained to use such equipment, and an existing business organization and business relationship. By its own admission, the petitioner's acquisition of Superior produced revenues of over $ 740,000 during a 14-month period when, because of shortages in fuel, supplies, and experienced personnel, and because of adverse weather conditions, the market *487 as a whole was otherwise depressed. Accordingly, we hold that the evidence affirmatively establishes that there was a going-concern value present, and we further hold that the residual method of valuation was properly employed in this case to value such asset. Having already established that the total consideration paid was $ 614,408.95, we turn now to the fair market value of the tangible assets. It is generally accepted that the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion and both parties are fully informed of all the relevant facts and circumstances, establishes fair market value. Bankers Trust Co. v. United States,518 F. 2d 1210, 1219 (Ct. Cl. 1975), cert. denied 424 U.S. 966 (1976); Staley v. Commissioner,41 B.T.A. 752 (1940); Newberry v. Commissioner,39 B.T.A. 1123, 1129 (1939). The petitioner presented the testimony of numerous experts in support of its valuation of the equipment, trucks, and real estate. The Commissioner's valuations were based on the testimony of one expert, who was an employee of the Commissioner. With *488 respect to the equipment, the petitioner presented the testimony of five experts to support its fair market value determinations. Mr. Black, the only expert who inspected the equipment and observed it in operation, testified that all of the equipment was particularly suited to the cable-plowing business and was in good operating condition. He valued all of the equipment, and each of the other four experts valued one or more pieces of the equipment. Each of these experts had years of experience buying, selling, and generally dealing with the equipment he valued. They assumed the equipment was in good condition, and they valued it in the light of local market conditions during 1972, which included rampant inflation, a banner year for the construction industry, and high demand for some of the equipment. None of the experts used published guides, such as the Blue Book or Green Guide, in valuing the equipment at $ 377,614.49. To determine the fair market value of the trucks, the petitioner presented the testimony of four experts. Mr. Black valued the trucks at the time of purchase and determined, based on the good condition of the trucks and the improvements Superior made to them, *489 that they were worth $ 66,983.52 on July 27, 1972. One of its experts had extensive experience in the sales of trucks, and he expressed his view as to the values of the cabs and chassis of the trucks based on his knowledge of actual sales in the area. Another expert, who was an experienced local franchise dealer for large trucks, valued the White Coe tractor based on local market conditions, the condition of the truck, and the fact that it was specially out-fitted for cable-plowing work. The fourth expert was the fleet manager of the petitioner, and he testified as to the value of the improvements which Superior had made to the trucks for use in cable-plowing work. None of such experts relied on price guides, in the first instance, to determine value, although one expert pointed out that the values determined by him were lower than those in a local price guide. To value the land and building, the petitioner presented the testimony of a licensed real estate broker who had lived in the Charlottesville area since 1939 and had been licensed in Virginia since 1958. He had appraised, bought, built, and sold real estate in the area on numerous occasions. In May 1972, at the request *490 of Superior, he had appraised the property in issue in the light of its manufacturing zoning use and concluded that 2.07 acres of land was worth $ 22,500, and that the building was worth $ 15,000. At trial, he and the petitioner adopted such fair market value determinations. The Commissioner's expert relied on a formula and the Green Guide to value the equipment at $ 262,892 in his original report. For the equipment purchased by Superior in 1971, he used the Green Guide to determine the 1973 or 1974 new cost of seven different models of the equipment and the 1973 or 1974 resale prices of such models purchased in 1973; he then divided the resale price by the new price to determine a ratio for each type, and he computed the average of such ratios to be 73 percent. He then multiplied the original cost of the equipment to Superior by 73 percent to reach its fair market value on July 27, 1972. For the Superior equipment purchased in 1969, the Commissioner's expert used the same procedures in arriving at a ratio of 57 percent. Since the Green Guide did not contain sufficient data to conduct such an analysis for the assets purchased by Superior in 1968, he picked a 50-percent ratio. *491 He valued the equipment purchased by Superior in 1972 at its cost to Superior. One week before the trial, the Commissioner's expert amended his original report because he claimed it was in error with respect to the 1971 and 1969 equipment. According to him, the proper procedure for such equipment was to "take the 1972 resale price of the equipment from the 1972 Green Guide and divide that number by the cost new of that same piece of equipment in the 1971 and 1969 Green Guide respectively." Using this modified procedur, he determined that the proper ratio for the 1971 equipment was 63 percent and for the 1969 equipment, 65 percent. Under his amended procedure, he valued all the equipment at $ 237,337. The Commissioner's expert determined the fair market value of the trucks by telephoning one Chevrolet dealership, one Dodge dealership, one Ford dealership, etc., in Atlanta, Ga., giving them the serial numbers of the trucks handled by them, stating the trucks were in average condition, and asking their opinion as to the value of the trucks. Using this method, he determined the trucks had a fair market value of $ 31,200. In valuing the land and building, the Commissioner's expert *492 concluded "that the value of $ 12,500.00 assigned to 1.45 acres of land" is reasonable after examining comparable sales and viewing the neighborhood. He also concluded that the improvements to the land were valueless, except for the fence, because I-64 made the site useless as a gas station. We are not wholly persuaded by the expert testimony presented by either party. On the one hand, the Commissioner's expert did attempt to value the equipment by use of an objective method, but there are several serious defects in his analysis. The evidence establishes that there was a strong demand for the equipment which was hard to come by in the local market, that prices were spurred on by inflation, that the equipment was in good operating condition, and that the equipment was specifically tailored for use in the cableplowing business. However, the Commissioner's expert did not consider any of these factors in valuing the equipment. Moreover, his ratios were based on only a few examples, and there is no indication that the selected examples were representative. In addition, there is no basis for his treatment of the equipment acquired by Superior in 1968 and 1972. Finally, in valuing *493 the trucks, the Commissioner's expert failed to take into consideration their good condition, their special equipment for the cable-plowing business, and the conditions of the local market. On the other hand, the petitioner's expert witnesses all had extensive experience and took into consideration many of the relevant factors in valuing the equipment and trucks. Yet, most of those witnesses were persons with whom the petitioner did business so that such experts, just as the Commissioner's expert, may not have been altogether disinterested. In addition, the views expressed by the petitioner's experts were not grounded generally on objective facts; they presented no comparable sales or other objective evidence to support their opinions. Finally, they ask us to find that the equipment and trucks which Superior had acquired over a period of years at a cost of $ 427,553.46 had a value of $ 444,598.01 in July 1972. Despite the inflation and strong local demand, we are not convinced that such equipment and trucks had a value which exceeded their cost. The valuation of the land and building presents an easier question. The testimony of the petitioner's expert was persuasive, and *494 the Commissioner's expert was obviously incorrect in some of his assumptions. He was wrong in his understanding of the size of the lot, and we are not convinced that the building had no worthwhile use even though it could no longer be used profitably as a service station. In addition, he overlooked the fact that 8 months before Black acquired the property, Superior paid approximately $ 24,000 for it. In the light of these circumstances, we accept the petitioner's valuation of the land and building. In this case, there is no precise method for determining the exact value of the equipment and trucks in July 1972, but we must evaluate all of the evidence in the light of our own "experience with the mainsprings of human conduct to the totality of the facts of each case" ( Commissioner v. Duberstein,363 U.S. 278, 289 (1960)) and reach a conclusion as to the value of such equipment and trucks by the exercise of the best judgment available to us. Accordingly, we find and hold that the equipment, trucks, land, building, and going-concern value had the following fair market values at the time Black acquired them from Superior: Asset
Value
Equipment
$ 340,000.00
Trucks
60,000.00
Land
22,500.00
Building
15,000.00
Going-concern
44,598.01
*495 Such values constitute the bases of such assets in Black's hands. [3]
Decision will be entered under Rule 155. Footnotes
1. Superior filed its income tax returns on the basis of a taxable year ending Nov. 30, and we will identify its taxable years by the calendar years in which they ended.↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
3. In his brief, the Commissioner argues we should decrease the basis in the depreciable assets to the extent the escrowed stock was cancelled to reimburse Black for payment of property taxes. In our judgment, such issue is not timely raised by the Commissioner, and in any event, the only evidence on the issue supports the petitioner.↩