Hubert T. Albachten and Rosella A. Albachten v. Commissioner.
Albachten v. Commissioner
Docket No. 2650-70 SC.
United States Tax Court
T.C. Memo 1971-229; 1971 Tax Ct. Memo LEXIS 103; 30 T.C.M. (CCH) 984; T.C.M. (RIA) 71229; September 8, 1971, filed Hubert T. Albachten, pro se, 1260 Cotton St., Menlo Park, Calif. Edward B. Simpson, for the respondent. SACKS Memorandum Findings of Fact and Opinion SACKS, Commissioner: Respondent determined deficiencies in petitioners' Federal income tax for the years 1966 and 1967 in the respective amounts of $250 and $31.25. The sole issue for decision is whether the purchase by petitioners of shares of the capital stock of the Palo Alto Hills Golf and Country Club, a California Corporation, in 1958, was a transaction *104 entered into for profit, so that the loss sustained by them upon the subsequent disposition of such stock in 1966 was a deductible loss under section 165(c)(2) of the Internal Revenue Code of 1954. Findings of Fact Hubert T. Albachten and Rosella A. Albachten are husband and wife who resided at 1260 Cotton Street, Menlo Park, California at the time of filing of their petition herein. They filed joint Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue at San Francisco, California. Sometime in 1968 a corporation known as the Palo Alto Hills Golf and Country Club (hereinafter referred to as the Club) was organized under the laws of the state of California. Its purposes were to provide a recreational and social facility through the construction, ownership and maintenance of an 18 hole golf course, a golf pro shop, a swimming pool, a bar and a dining room which would also provide food services in and about the pool area. The Club was to be located at 2700 Page Mill Road in Palo Alto, California and its facilities, subject to certain exceptions, were to be for the use of its members only. Memberships *105 in the Club were classified as "social" and "golfing." In or about October of 1958 petitioners herein were approached by the management of the Club and solicited to buy stock - i. e., a membership - therein. Petitioners responded to this solicitation by purchasing a "golfing" membership represented by capital stock of the Club for which they paid $1,500. At the time, it was pointed out to them that this purchase price compared favorably with the membership cost of a neighboring country club - Los Altos Golf and Country Club - whose memberships were selling for between $2,200 and $3,000. In October of 1958 the Club owned nothing but unimproved land. As the next two years passed this land was gradually converted into a golf course, club house and pool with appurtenant dining and golf pro facilities. This was not done, however, without some additional cost to the membership and in October of 1959 petitioners were assessed and paid an additional capital contribution of $100. Likewise in August of 1960 and in February of 1962 petitioners were assessed and paid the additional sums of $925 and $500 respectively, thus giving 985 them a cost basis of $3,025 for their capital stock-membership *106 in the Club. It was not until February of 1960 that the Club's golf course was completed, and in that month monthly dues of $38.40 began to be collected from the members as had previously been agreed upon. Later that year a clubhouse and other facilities were also completed. Prior to purchasing their membership in the Club, petitioner Hubert Albachten had not played golf since 1941 and petitioner Rosella Albachten had never played golf. After the completion of the golf course and clubhouse late in 1960 petitioner Hubert Albachten began to play golf at the Club on the order of two or three times a month and petitioner Rosella Albachten on the average of once a month. The children of petitioners also began to use the facilities, namely, the swimming pool and for the purchase of clothes at the pro shop. In September of 1961 the Club's dues were increased to $44 per month and remained at that figure until May of 1963 when they were increased to $60.50 per month. Also in early 1964 the Club began to assess its members a mandatory $60 per calendar quarter minimum charge for food and beverages. During the entire period of petitioners' membership in the Club they spent very little over *107 and above the actual cost of dues and the mandatory quarterly minimum charge assessed by the Club. They paid dues during the years 1960 through 1965 as follows: Year
Amount
1960
$ 422.40
1961
483.20
1962
528.00
1963
746.00
1964
721.00
1965 726.00
Total
$3,626.60
The charges to them for food and beverages for the years 1962 through 1965 were as follows: 1962
$ 65.68
(total of separate charges over 9 or 10 months)
1963
46.59
(total of separate charges over 10 months)
1964
* 241.05
(total of separate charges over 12 months)
1965
* 249.86
(total of separate charges over 12 months)
$603.18
In January 1966, petitioners sold their membership in the Club and received $1,900. Taking into consideration petitioners' adjusted basis of $3,025, they incurred a $1,125 loss on the disposition. On their 1966 Federal income tax return petitioners reported a long-term capital loss of $1,125, with a deduction therefore limited to $1,000. In 1967 petitioners claimed the remaining $125 as a capital loss carryover. Respondent disallowed the claimed loss and loss *108 carryover on the ground that the transaction creating the loss, (viz. the purchase of the capital stock-membership) was not a transaction entered into for profit within the purview of section 165(c)(2) of the Internal Revenue Code of 1954, but rather a personal transaction the expenses of, or losses incurred upon which, are specifically made nondeductible by section 262 of the Code. Opinion It has long been a settled principle of the tax law that deductions, such as the one claimed by petitioners, are matters of legislative grace, and that taxpayers seeking them must clearly prove that they are entitled to them. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). In the instant case, section 165(c)(2) of the Code provides a deduction for losses incurred "in any transaction entered into for profit." A taxpayer seeking a deduction under this section must clearly prove not only that, in entering into the transaction the profit making motive was the prime thing, James E. Austin, 35 T.C. 221 (1960), affd. 298 F. 2d 583 (C.A. 2, 1962); Moses Cohen 44 B.T.A. 709 (1941); but also that that motive continued *109 to dominate any other throughout the life of the transaction. Evans v. Rothensies, 114 F. 2d 958 (C.A. 3, 1940). In their excellent brief filed herein petitioners have recognized the heavy burden of proof which they must carry in order to prevail - largely through oral testimony. And they have pointed out to us that: A taxpayer's direct testimony that profitmaking was his primary purpose, although it suffers from the heavy burden of being self-serving, is not to be put aside without consideration simply because there exists other evidence of some objective circumstances. The evidence must be considered and evaluated as a whole. 986 Yet, considering the evidence as a whole, we are not persuaded that petitioners' prime motive in purchasing the capital stock-membership in the Club in 1958 was to make a profit. Taking into account the initial cost of the stock-membership, the fact that the Club's facilities were not completed, the awareness on the part of petitioners that monthly dues of no small amount would have to be paid in addition to their capital contribution, and the fact that there was an established golf club already in the neighborhood, we are unable *110 to find the profit making potential in the transaction which is the sine qua non to a conclusion by the Court that the transaction was profit motivated. Moreover, even if we were able to find that petitioners possessed an initial profit making motive, we think the evidence is overwhelming that such motive could not have continued to be a dominant one since it is clear that the additional capital contributions required of and paid by petitioners and the substantial increases in dues and mandatory charges would have blotted out even the most reasonable expectation of turning a profit, however modest. Reviewed and adopted as the report of the Small Tax Case Division. Decision will be entered for the respondent. Footnotes
*. (Includes mandatory $60 per calendar quarter minimum charge)↩