## EVANS v. ROTHENSIES, Collector of Internal Revenue.

## No. 7220.

Circuit Court of Appeals, Third Circuit.

Sept. 23, 1940.

960

Bernard V. Lentz, Thomas Raeburn White, and White & Staples, all of Philadelphia, Pa., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, J. Louis Monarch, and Paul R. Russell, Sp. Assts. to Atty. Gen. (J. Cullen Ganey, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., of counsel), for appellee.

Before BIGGS, CLARK, and JONES, Circuit Judges.

JONES, Circuit Judge.

In his income tax return for the year 1935, the appellant taxpayer showed an alleged capital loss as an offset against capital gains. The Commissioner of Internal Revenue disallowed the loss thus claimed and determined and assessed a deficiency for the taxable year which the appellant paid under protest. The taxpayer's claims for refund having been denied, he filed suit in the court below against the Collector of Internal Revenue for the recovery of so much of the deficiency tax payment as was represented by the disallowance of the alleged capital loss. The case was tried to the court below without a jury and, upon findings of fact made, the court concluded that the loss claimed by the taxpayer had not been established and that it was therefore not allowable as a deduction. Accordingly, judgment for the defendant was entered from which the taxpayer appeals.

From the findings of fact made by the trial court, all of which are fully supported by the evidence, and from the undisputed facts appearing of record, we summarize as follows: On April 10, 1931, Powell Evans, the taxpayer, became the owner of a bond of Merchant & Evans Company, a corporation (hereinafter referred to as the company), in the principal sum of $300,000, secured by the company's mortgage, which was a first lien upon all of its operating properties. At the beginning of the year, 1935, the bond represented a cost to Evans of $241,500. On February 9, 1935, the taxpayer (who was also the owner of a majority of the company's preferred stock), Thomas Evans, the taxpayer's brother (who was the owner of a majority of the company's common stock), and the company entered into a written agreement, looking to a reorganization of the company's capital structure. It was therein agreed that the authorized common stock of the company should be reduced by 3,500 shares and that 3,500 shares of a new class of stock (prior preferred) should be authorized by the company for issuance thereafter to the taxpayer in exchange for the company's bond and mortgage which he then held. The steps necessary to carry this agreement into effect were immediately entered upon with the result that, on June 4, 1935, the company issued to the taxpayer the 3,500 shares of its new prior preferred stock in consideration of the taxpayer's cancellation of the company's bond and mortgage. No question is here involved of a taxable gain or loss on this transaction. The court below properly affirmed a request by the taxpayer for a conclusion of law to that effect. The cost of the bond ($241,500) at once became the cost to the taxpayer of the 3,500 shares of prior preferred stock.

On December 10, 1935, the taxpayer entered into a written agreement with his son-in-law, Henry A. Adams (the husband of the taxpayer's only child), whereby Evans, the taxpayer, agreed to sell to Adams 3,000 shares of the prior preferred stock which Evans had received in exchange for the company's bond and mortgage. Adams agreed to pay Evans $84,000 for the shares. The agreement expressly provided, however, that Adams would pay and Evans would accept "in full settlement of the said purchase price" an annuity payable by Adams, in semi-annual installments on specified dates, for Evans' life and, after his death, to his wife for the remainder of her life. Under the agreement, 2,956 of the 3,000 shares of prior preferred stock were placed in escrow with a trustee as security, directly and indirectly, for the payments due by Adams to the annuitant, 956 of the escrowed shares being allocated by the agreement as security for four individual guarantors of the first seven payments called for by the annuity agreement. The four individual guarantors for the limited number of payments were officers or employees of the company, one being the auditor and another the treasurer of the company.

The preferred stock, which was the subject matter of the sale and annuity agreement, contained dividend requirements, graduated by years, in the aggregate sum of $7,000 for 1936, $10,500 for 1937, $14,000 for 1938, and $17,500 for 1939 and

each year thereafter, while the annuity payments due by Adams, being likewise graduated by years, began at $4,000 in 1936, and reached a maximum of $13,000 for 1943 and each year thereafter. The annuity payments for which Adams was obligated would always be less for each year than the dividends payable on the preferred stock by an amount varying from $3,000 to $9,500 for the respective year. As the evidence also shows, except for the dividends on the transferred stock, Adams was without the means to make the annuity payments, his income receipts from all sources, exclusive of the stock transferred to him under the agreement, being $360 a month.

Shortly prior to entering into the sale and annuity agreement, which bears date of December 10, 1935, Evans offered for sale through an auctioneer two 50 share lots of the prior preferred stock. The auctioneer, after advertisement in local newspapers, sold fifty shares of the stock on November 27, 1935, twenty-five on December 4, 1935, and ten shares on December 11, 1935. Of the total of 85 shares thus sold, Adams (Evans' son-in-law) bought 46 shares, Mrs. Lucy P. Evans, "of the Evans family", 35 shares, and four officers or employees of the Merchant & Evans Company bought one share each, the latter being the same persons who were the individual guarantors of a limited number of annuity payments under the agreement between Evans and Adams to which reference has already been made. Except for the first 10 shares sold, for which Adams paid $29 a share, all of the shares were sold for $28 each,—admittedly "a low value" which Evans himself had placed on the shares, as an upset price, at the time he offered them for sale. As Adams testified, the purchasers at the auction paid $28 for the shares because the auctioneer "wouldn't sell them any lower".

The consideration of $84,000 for the 3,000 share sale by Evans to Adams was arrived at by taking the price of $28 per share, derived at the auction sale, as fixing the fair market value of the shares. The $84,000 figure was then given by the taxpayer or his counsel to an actuary to prepare figures as to the possible annuity payments that could be made available "on a sliding scale basis" calculated on the expectancy of the taxpayer's wife. The fact that the taxpayer was also an annuitant was not taken into consideration in arriving at the amounts of the annuity payments. It is the difference between the cost to the taxpayer of the prior preferred stock and the assumed value of the annuity, which the taxpayer received in exchange therefor, for which the latter claims a right of deduction for capital loss under § 23(e) (2) of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A.Int.Rev.Acts, page 672, to the extent of the percentage allowable under § 117(a) of the Act, 26 U.S.C.A.Int.Rev.Acts, page 707.

■ The appellant contends that the court below erred in basing a disallowance of the claim for deduction for capital loss upon the conclusion that, in exchanging securities for an annuity, the owner made a disposition of the securities in a manner which the law does not recognize as establishing a loss for the reason that the contract of annuity has no fair market value sufficiently ascertainable so as to be able to serve as the subtrahend in the subtraction from the cost of the exchanged securities. It has been held that the actuarial or theoretical value of an annuity, when issued, cannot be used as the basis for determining a loss claimed by reason of the annuitant's death before fulfillment of the expectancy upon which the annuity was computed. Helvering v. Louis, 64 App.D. C. 263, 77 F.2d 386, 99 A.L.R. 620, and Industrial Trust Co. v. Broderick, 1 Cir., 94 F.2d 927. In the Louis case, supra, there was the additional fact that the annuitant had received at the time of his death annual payments aggregating a sum in excess of the cost of the annuity. However, we do not regard that fact as significant to the claim for capital loss calculated either on the expected returns from the annuity or its cost. The rule of no determinable capital loss is the same where the annuitant receives, in the aggregate, a sum less than either the cost of the annuity or the anticipated annual payments for the period of expectancy. Industrial Trust Co. v. Broderick, supra. Whether an annuitant lives a longer or shorter time than his expectancy is immaterial to the question of the value of the annuity. Elements of value other than the right to receive payments for life are present in an annuity, e. g., security, assurance of income, regularity of payments and relief from responsibility of attending to investment. The experience which actually develops for the

annuitant, whatever that may be, extinguishes both the annuity's cost and its expected returns as a capital investment.

■ In the case of Commissioner of Internal Revenue v. John C. Moore Corp., 2 Cir., 42 F.2d 186, which the appellant cites, it was said that the exchange of real estate in that case for an annuity payable by the grantee amounted to a purchase of the annuity for the agreed upon valuation of the real estate. The question of loss to the annuitant on the property exchanged for the annuity on the basis of the value of the annuity was not there involved. It was the valuation of the real estate, as agreed upon by the parties, that was accepted as being thus established; and that value determined the cost of the annuity. But, neither the cost nor the actuarial value of the annuity was used as evidence of the value of the real estate given for the annuity, which is what the taxpayer seeks to do in the present case. In addition to the non-appraisable elements of value ordinarily incident to an annuity, whether Evans would ever receive any annuity payments under the contract with Adams depended in a very real sense upon whether the company continued to earn and pay dividends wherewith Adams could make the payments called for by the annuity. Unless Adams was so enabled to pay, Evans' right of redress for a default by Adams in annuity payments was definitely limited by the contract to such satisfaction as was obtainable through the security of the escrowed stock. Particularly, in these circumstances, the contract of annuity could not be said to have a fair market value upon which a loss to Evans could be determined upon his transfer of his stock in exchange for the annuity; and the court below rightly so concluded.

■ Moreover, the transaction was not one entered into for profit. That it be such is basic to a taxpayer's right to claim a deduction for loss under § 23(e) (2) of the Revenue Act of 1934. The appellant argues that his acquisition of the company's bond and mortgage in 1931, for which he received the prior preferred stock in exchange in 1935, was the transaction which was entered into for profit. So much may be conceded. But, as a transaction which originally is not entered into for profit may by later change become one for profit (Heiner v. Tindle, 276 U.S. 582, 48 S.Ct. 326, 72 L.Ed. 714) and, hence, susceptible of producing gain or loss recognizable as

such for income tax purposes, just so may a transaction which is entered into for profit become one not for profit when the owner's ultimate disposition of the property evidences a change in the nature of the transaction's intended purpose. The disposition of property as well as its acquisition is material to the question whether the transaction was entered into for profit within the contemplation of the income tax law. It is incumbent upon a taxpayer seeking a deduction to point to a statute authorizing it and to show that he comes within the statute's terms. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348. And, in a suit by a taxpayer to recover taxes assessed and collected, the burden rests upon him to prove all the facts necessary to establish the illegality of the collection. Niles Bement Pond Company v. United States, 281 U.S. 357, 361, 50 S.Ct. 251, 74 L.Ed. 901. Therefore, unless the appellant is able to show that the transaction for which a deduction for loss is claimed was throughout a transaction for profit, he is not entitled to claim the benefit of deduction for loss allowed by § 23(e) (2) of the Revenue Act of 1934. A transaction entered into or completed on a basis other than that of an ordinary business transaction does not qualify as one entered into for profit within the meaning of the revenue law. Candler v. Commissioner of Internal Revenue, 5 Cir., 76 F.2d 548, 549; Hines v. Commissioner of Internal Revenue, 7 Cir., 58 F.2d 29, 31; and Goldsborough v. Burnet, Commissioner, 4 Cir., 46 F.2d 432, 433.

■ It is essential to a transaction entered into for profit that the highest and best price be obtained for property sold. In the present case, Adams was selected by Evans as the transferee of the stock, not because he would pay the best price obtainable therefor, nor because of his responsibility as an underwriter of the annuity, but because of his close relationship to Evans. It is inconceivable that Evans would have transferred the stock to anyone outside the family on the same favorable terms to the purchaser contained in the annuity contract. Obviously, had Evans given the stock to Adams, he could not thereby have established a loss by the transfer. Yet, under the peculiar terms of the contract, the stock transfer, as actually made by Evans, was hardly more than a gift to Adams with a retention by Evans of a partial interest in the income from the

stock for the period of his own or his wife's life. There is nothing in the case from which it could be found that the price for the stock agreed upon by Evans and Adams was the highest and best price obtainable therefor.

Furthermore, the auction sale of a relatively few shares in a closely held family corporation was not sufficient to fix the fair market value of the 3,000 shares. The taxpayer asserts that the securities were depreciated, but whether they were and to what extent was not shown. From all that appears in the case, Evans by transferring the stock to Adams may have given the latter far more than either the cost or the actuarial worth of such an annuity, so that what Evans would denominate loss may represent no more than his gratuitous surrender of property for less than value. Consequently, a basis for determining a loss to Evans was not established.

The judgment of the District Court is affirmed.