212 CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF ARTHUR F. SCHULTZ, DECEASED, ROBERT C. SCHULTZ AND HAROLD H. SCHULTZ, EXECUTORS, AND MADELINE M. SCHULTZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos.. 8683–74, 8684–74.    Filed August 31, 1978.

*Joseph Getz* and *Robert N. Spaeder*, for the petitioners.
*Stephen R. Takeuchi*, for the respondent.

QUEALY, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Docket No. | Year | Deficiency |
|------------|------|------------|
| 8683-74 | 1968 | $334.00 |
| | 1969 | 667.00 |
| 8684-74 | 1968 | 1,709.49 |
| | 1969 | 3,488.97 |

By an amendment to his answer, the Commissioner claimed increased deficiencies as follows:

| Docket No. | Year | Deficiency |
|------------|------|------------|
| 8683-74 | 1968 | $714.00 |
| | 1969 | 1,429.00 |
| 8684-74 | 1968 | 2,128.50 |
| | 1969 | 4,349.98 |

In his amendment to the answer in docket No. 8684-74, the Commissioner claimed, in the alternative, increased deficiencies of $13,062.26 for 1968 and $3,637.36 for 1969.

The issues for decision are: (1) The amount to be treated as the investment in the contract by the individual petitioners in determining the taxability under section 72, I.R.C. 1954,[1] of an annuity received by them in exchange for certain property; (2) the manner of reporting the gain realized by the individual petitioners on the transfer of such property; and (3) the cost basis and useful lives of the properties received by the corporate petitioner for the purpose of computing its depreciation deductions.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner in docket No. 8683-74 is 212 Corporation (212 Corp.), which had its principal place of business in Erie, Pa., at the time it filed its petition in this case. It filed its corporate Federal income tax returns for 1968 and 1969 with the Philadelphia Service Center.

The petition in docket No. 8684-74 was filed by Arthur F.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue, unless otherwise indicated.

Schultz and Madeline M. Schultz, his wife, who, on the date of the filing of such petition, resided in Erie, Pa. They filed their joint Federal income tax returns for 1968 and 1969 with the Philadelphia Service Center. After the filing of the petition, Mr. Schultz died; Robert C. Schultz and Harold H. Schultz were appointed executors of his estate, and the estate was substituted as a party in this case.

Prior to June 30, 1968, Arthur and Madeline Schultz owned the property commonly known as 212 East 18th Street, Erie, Pa. (the 18th Street property), consisting of several parcels of land, a building, and a fenced parking area. They also owned the property known as 3831 West 12th Street, Erie, Pa. (the 12th Street property), consisting of a lot and building. As of June 30, 1968, their adjusted basis in such properties was $82,520.57. By an "Agreement of Sale and Annuity Contract" dated June 30, 1968, Mr. and Mrs. Schultz agreed to transfer such properties to the 212 Corp. in exchange for such corporation's promise to pay to them jointly, or to the survivor of them, the sum of $18,243.74 per year. Mr. Schultz was born on April 3, 1895, and Mrs. Schultz was born on August 20, 1895; for actuarial purposes, both were 73 years of age on July 1, 1968.

On July 1, 1968, Mr. and Mrs. Schultz conveyed the properties to 212 Corp. On the same date, 212 Corp. leased the properties to the Arthur F. Schultz Co. (Schultz Co.). The lease for the 18th Street property was for a term of 5 years, commencing on July 1, 1968, at a yearly rental of $25,500, payable in installments of $2,125 per month. The lease for the 12th Street property also was for a period of 5 years, commencing July 1, 1968, at an annual rental of $2,400, payable in monthly installments of $200. Schultz Co. was granted three independent 5-year options to renew each lease at the expiration of the preceding term. Under the terms of both leases, Schultz Co. was responsible for all maintenance and repairs, both interior and exterior.

Prior to and during 1968, Schultz Co. was wholly owned by Mr. Schultz, who was the president and principal operating executive of Schultz Co. during such period. Schultz Co. was incorporated in 1946 and, since at least the 1960's, has been engaged in the business of retail sales of appliances and furniture and commercial sales of supplies and equipment to restaurants, hotels, and the like. From 1946 to 1970, the principal business office, warehouse, and largest retail outlet of Schultz

Co. was located at the 18th Street property. From 1954 to 1972, one of the retail appliance store outlets was located at the 12th Street property. Prior to 1968, Schultz Co. had leased the properties from Mr. and Mrs. Schultz. Schultz Co. paid a gross yearly rental of $25,500 for the 18th Street property and a gross yearly rental of $2,400 for the 12th Street property under the terms of its leases with Mr. and Mrs. Schultz. However, under the terms of such leases, the lessor was responsible for repairs and maintenance.

The 212 Corp. was formed in 1968 and was owned by Robert C. Schultz (Robert) and Harold H. Schultz (Harold), the sons of Mr. and Mrs. Schultz, and Jerome H. Blakeslee (Jerome), who was the son-in-law of Mr. and Mrs. Schultz. The first meeting of 212 Corp. was held on July 15, 1968. At such meeting, Robert was elected president, Jerome was elected vice president, and Harold was elected secretary and treasurer of the corporation. Also at such meeting, the purchase of the 18th Street and 12th Street properties from Mr. and Mrs. Schultz was approved. It was agreed to pay for such properties with a joint survivor annuity payable to Mr. and Mrs. Schultz. The leases to the Schultz Co. also were approved. In 1968 and 1969, the three owners of 212 Corp. were the officers of the corporation, but received no compensation. There were no other employees.

The same attorney and the same certified public accountant had represented Mr. and Mrs. Schultz from at least 1960 through 1968. That attorney and CPA represented both Mr. and Mrs. Schultz and 212 Corp. in the negotiations relating to and consummation of: the transfer of the properties from Mr. and Mrs. Schultz to 212 Corp. by deed dated July 1, 1968; the lease agreement between 212 Corp. as lessor and Schultz Co. as lessee; and the annuity contract between 212 Corp. and Mr. and Mrs. Schultz. That attorney and CPA also represented Robert, Harold, and Jerome in the formation and incorporation of 212 Corp.

The transactions involved in this case were all part of a plan proposed by the CPA in order to effect income and estate tax plans for Mr. and Mrs. Schultz. The original plan submitted by the CPA to Mr. Schultz, on January 16, 1968, proposed a transfer of only the 18th Street property for a consideration of $200,000. Mr. Schultz had in mind a price of $200,000 for the property

because he had received an offer to purchase such property at such price from the Prudential Insurance Co. in 1952.

In 1952, the area surrounding the 18th Street property was a good business neighborhood. However, from 1952 through 1968, such neighborhood had declined drastically and had become a ghetto area, making it necessary to institute certain security measures to protect both the customers of Schultz Co. and the property itself. Yet, despite the neighborhood, Schultz Co. was able to continue to operate successfully at such location. Moreover, in 1968, there were plans to restore and rehabilitate the area under the model cities plan. The building at 18th Street was four stories high. It was constructed in 1903; it had originally been used for manufacturing, but had been converted by Schultz Co. to a combination warehouse and commercial and retail outlet. The building had been well maintained and was in good condition.

The discussions leading to the transfer of the properties began in March of 1968, when Mr. Schultz met with Robert, Harold, and Jerome. At such meeting, he stated that he was thinking of selling the 18th Street property and asked the others if they were interested in buying it. Mr. Schultz stated that he had a plan whereby the property would be transferred to a separate corporation to be owned by Robert, Harold, and Jerome. According to the plan, Schultz Co. would rent the property from such corporation, and the corporation would use the rentals to pay Mr. Schultz for the property and to pay taxes and insurance. However, at such time, Mr. Schultz did not give the others a copy of the plan proposed by his CPA.[2] Mr. Schultz told Robert, Harold, and Jerome that if they were interested in purchasing the property, they should meet with his attorney, who would explain the details of the plan.

Early in April 1968, Robert, Harold, and Jerome met with the attorney, who outlined to them the details of the plan. They were interested in the plan, but believed that the 12th Street property also should be conveyed to them, so that Schultz Co. would be renting from one landlord. They were particularly interested in the 12th Street property because of its low price;

---

[2]It is not clear whether the purchase price for the property was discussed in March of 1968. Harold testified that he was not made aware of the purchase price until June of 1968. However, Robert testified that his father told them at the initial meeting in March of 1968 that the selling price for the property would be $200,000.

Robert believed his father had paid approximately $22,000 for the property.[3]

The 12th Street property was located in the midst of an active and growing business section on the western border of Erie, Pa., close to the airport, other large shopping centers, schools, churches, and recreation areas. A one-story concrete block building had been constructed on the property in 1952. The location was a commercially desirable one, and the building was suitable for many retail uses.

Mr. Schultz was agreeable to including a transfer of the 12th Street property as part of the plan, and a selling price of $25,000 was established for such property. In June of 1968, Robert, Harold, and Jerome held a second meeting with the attorney to discuss the plan as amended to include both properties.

At the time these negotiations transpired, Robert, Harold, and Jerome were employed by Schultz Co. Robert and Harold had worked almost their entire lives for Schultz Co.; each had begun his employment there at the age of 11. Jerome had commenced his employment with Schultz Co. in February of 1947. All three held executive positions with Schultz Co., but on July 1, 1968, only Robert and Harold were officers; Robert was vice president and Harold was secretary.[4]

Robert, Harold, and Jerome were educated, intelligent, and experienced businessmen who entered into the transaction with Mr. Schultz after having considered and discussed the plan offered to them. They were not ordered or influenced by Mr. Schultz, but acted of their own volition. However, Robert, Harold, and Jerome had very little to do with the drafting, approval, and implementation of the plan. Moreover, at least with respect to the 18th Street property, Robert, Harold, and Jerome had no input into determining the selling price. There were no negotiations concerning this price; rather, the $200,000 price was set by Mr. Schultz.

The rents to be paid by Schultz Co. were calculated and expected to be sufficient to fund the annuity. In fact, Schultz Co. assumed the responsibility for maintenance and repairs so that, after deductions for insurance, income and real estate

---

[3]In fact, Mr. Schultz had a cost basis (before depreciation) of $25,237.19 in such property.

[4]At the time of trial, Robert was president, Harold was vice president, secretary, and treasurer, and Jerome was a vice president of Schultz Co. The business of Schultz Co. had grown from annual sales of $2.8 million in 1968 to annual sales of $6 million.

taxes, and certain miscellaneous expenditures, the rental payments would be sufficient to cover the annuity payments. The 212 Corp. had no source of income other than the rents from the properties transferred to it. The only assets of 212 Corp. during 1968 and 1969 consisted of some $4,000 in cash, some $500 in capitalized organizational expenses, and the properties transferred to it by Mr. and Mrs. Schultz. Robert, Harold, and Jerome probably would have agreed to pay as much as $300,000 for the properties so long as the annuity could have been paid from the rentals on them.

In May of 1968, Mr. Schultz retained Richard W. Ruth and William G. Eckert, real estate appraisers, to make appraisals of the 18th Street property and the 12th Street property. The CPA recommended that such appraisals be obtained in order to substantiate the values of $200,000 for the 18th Street property and $25,000 for the 12th Street property. In his written report, Mr. Ruth expressed the opinion that the fair market value of the 18th Street property was $95,000, and that the fair market value of the 12th Street property was $22,000, yielding a total for the two properties of $117,000. Mr. Eckert also prepared a written report. In Mr. Eckert's opinion, the fair market value of the 18th Street property was $110,000, and the fair market value of the 12th Street property was $22,000, for a total of $132,000. However, neither appraiser was aware of the existence or terms of the leases between Schultz Co. and 212 Corp. with respect to the properties. Each appraiser assumed that Schultz Co. would vacate the properties and, therefore, valued them as vacant properties, without a known tenant for a known period of years. Robert, Harold, and Jerome obtained no appraisals of the properties prior to entering into the contract of sale and annuity agreement and were not shown the appraisal reports obtained by Mr. Schultz.

The agreement of sale and annuity contract entered into by Mr. and Mrs. Schultz and 212 Corp. contained the following provision with respect to the purchase price of the properties:

6. 212 agrees to pay Schultz for said property the total sum of $225,000, which total sum is attributable to the respective properties included in this sale as follows:

(a) For all the property commonly known as 212 East 18th Street, the sum of $200,000.

(b) For all the property commonly known as 3831 West 12th Street, the sum of $25,000.

The agreement provided for payment of the total purchase price of $225,000 by means of a yearly annuity of $18,243.74, payable to Mr. and Mrs. Schultz, jointly during their lifetimes, and thereafter to the survivor of them. The annuity was payable in monthly installments of $1,520.31. The amount payable annually was calculated by the CPA based upon the tables contained in Rev. Rul. 62–216, 1962–2 C.B. 30.

The parties further agreed that the annuity payments should be considered a charge upon the rents and profits realized by 212 Corp. from the property conveyed to it. Moreover, 212 Corp. was not permitted to mortgage or sell any of the property without first obtaining the written consent of Mr. and Mrs. Schultz. As further security, 212 Corp. authorized confession of judgment against it in the event of a default.

At the trial, the appraisers, Mr. Ruth and Mr. Eckert, were called as witnesses. They had been informed of the leases on the properties, and they were asked their opinion of the value of the properties in the light of such information. Mr. Ruth concluded that because of the lease, the value of the 18th Street property was $205,000. Based upon an alleged sale of the 12th Street property in 1969, Mr. Ruth concluded that its fair market value as of 1968 was $35,000. Mr. Eckert was also of the opinion that the leases increased the value of the properties; he found the value of the 18th Street property to be $204,600 and that of the 12th Street property to be $23,600.

On their joint Federal income tax returns for 1968 and 1969, Mr. and Mrs. Schultz took the position that their "investment in the contract," for the purpose of computing the exclusion ratio of section 72, was $225,000, the alleged fair market value of the properties transferred. Accordingly, they excluded from gross income 76.13 percent of the annual annuity payments received by them. In his notice of deficiency, the Commissioner took the position that Mr. and Mrs. Schultz' "investment in the contract" was limited to the value of the annuity received in exchange for the properties.[5] Using the tables contained in section 20.2031–7(f), Estate Tax Regs., the Commissioner determined that the value of the annuity received was $169,603.56, rather than

---

[5]The Commissioner did not, as the petitioners allege, rely upon his Rev. Rul. 69–74, 1969–1 C.B. 43, to the effect that an annuitant's investment in the contract is limited to the adjusted basis of the property transferred. Such position was taken by the Commissioner in his 30-day letter, but apparently was abandoned by him, for it did not form the basis of the deficiency notice.

$225,000 as determined by the CPA. The Commissioner recomputed the exclusion ratio and determined that only 57.386 percent of the annual annuity payments was excludable from gross income.

On their joint Federal income tax returns for 1968 and 1969, Mr. and Mrs. Schultz reported no gain from the transfer of their properties in exchange for the annuity, asserting that no gain was reportable until they had fully recovered their basis in the properties. In his notice of deficiency, the Commissioner determined that Mr. and Mrs. Schultz had realized a long-term capital gain of $87,082.99 (the difference between their adjusted basis in the properties transferred and the value of the annuity), and that such gain was reportable ratably over the life expectancy of Mr. and Mrs. Schultz.

By an amendment to his answer, the Commissioner claimed increased deficiencies. Relying upon the real estate appraisals made by Mr. Ruth and Mr. Eckert, the Commissioner determined that the fair market value of the properties transferred was $124,500, the average of the two appraisals. Accordingly, he found that the "investment in the contract" did not exceed such value. He recalculated the exclusion ratio and determined that only 42.125 percent of the annual annuity payments was excludable from gross income. He also recomputed the long-term capital gain, which he determined to be $41,979.43,[6] reportable ratably over the life expectancy of Mr. and Mrs. Schultz. In the alternative, the Commissioner claimed that the entire capital gain was reportable in 1968, the year of the transfer.

On its Federal income tax returns for 1968 and 1969, 212 Corp. claimed a cost basis of $225,000 for the two properties transferred to it, $153,925 of which it allocated to depreciable buildings and improvements. It based its depreciation deductions on a useful life of 12½ years for the building on the 18th Street property and a useful life of 20 years for the building on the 12th Street property. In his notice of deficiency, the Commissioner

---

[6]Such figure is the difference between Mr. and Mrs. Schultz' adjusted basis in the properties and the alleged fair market value of the properties at the date of the transfer. To the extent the alleged value of the annuity received exceeded the alleged fair market value of the properties transferred, the excess was deemed to be a gift from 212 Corp. to Mr. and Mrs. Schultz.

determined that the total cost of the two properties was $169,604,[7] the value of the annuity at the date of the transaction. He allocated $99,048 of such cost to the building and improvements on the 18th Street property and $16,980 to the building on the 12th Street property, and reduced 212 Corp.'s depreciation deductions accordingly.

By the amendment to his answer, the Commissioner also claimed increased deficiencies against 212 Corp. In line with his conclusion that the value of the properties was only $124,500, he determined that 212 Corp.'s basis did not exceed such value. He allocated $96,300 to the building and improvements on the 18th Street property and $18,100 to the building on the 12th Street property. The Commissioner further determined that the useful life of the building on the 18th Street property was 20 years and that the useful life of the building on the 12th Street property was 50 years, also based upon the real estate appraisers' reports. He reduced the corporation's depreciation deductions accordingly.

## OPINION

The rules governing inclusion in income of annuity payments are prescribed by section 72, which provides in relevant part:

SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(a) GENERAL RULE FOR ANNUITIES.—Except as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract.

(b) EXCLUSION RATIO.—Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). * * *

(c) DEFINITIONS.—

(1) INVESTMENT IN THE CONTRACT.—For purposes of subsection (b), the investment in the contract as of the annuity starting date is—

(A) the aggregate amount of premiums or other consideration paid for the contract, * * *

The first issue we must decide is the amount of Mr. and Mrs. Schultz' investment in the contract, as defined in section 72(c)(1).

---

[7] In this notice of deficiency, the Commissioner rounded the value of the annuity to the nearest dollar.

It is now well settled that in cases in which appreciated property is transferred in consideration for an annuity, the annuitant's investment in the contract is the fair market value of the property transferred. *Estate of Bell v. Commissioner*, 60 T.C. 469, 472–473 (1973); *deCanizares v. Commissioner*, 32 T.C. 345, 353 (1959); *Gillespie v. Commissioner*, 38 B.T.A. 673, 677 (1938); but see Rev. Rul. 69–74, 1969–1 C.B. 43. However, such rule is applicable only when the parties are dealing at arm's length. Where the fair market value of the property transferred substantially exceeds the value of the annuity received, such excess is deemed to be a gift in the absence of proof to the contrary, and the taxpayer's investment in the contract is limited to the value of the annuity. *Estate of Bell v. Commissioner, supra.* Thus, we must find both the value of the annuity and the value of the properties transferred in exchange for it.

In determining that the value of the annuity was $225,000, the petitioners relied upon Rev. Rul. 62–137, 1962–2 C.B. 28, and Rev. Rul. 62–216, 1962–2 C.B. 30, which provided that certain annuities may be valued by reference to the values of commercial annuities. On the other hand, the Commissioner's valuation of $169,603.56 was based on the annuity tables set forth in section 20.2031–7(f) of the Estate Tax Regulations. The petitioners claim that the commercial tables furnish more appropriate figures; they object to the actuarial tables in the Estate Tax Regulations because, they allege, such tables are based upon outmoded statistical data. They further object because the tables do not take into consideration the different life expectancies of men and women.

At the trial, the Commissioner presented an expert witness who testified that the rates charged by life insurance companies are affected by several factors not present in a private annuity transaction. For example, the price charged for a commercial annuity includes a "loading factor" for anticipated expenses and profits. Commercial companies generally are subject to State regulation; they are restricted in their investments, and are required to maintain reserves to assure that they are able to meet their annuity payment obligations. Moreover, commercial annuitants, as a self-selected class, have a longer life expectancy than the general population. All of these factors operate to increase the cost of a commercial annuity.

This same issue, together with the same arguments, was

considered in *Estate of Bell v. Commissioner, supra,* where it was held that the actuarial tables in the Estate Tax Regulations could be used by the Commissioner in valuing a private annuity. See also *Dix v. Commissioner,* 392 F.2d 313, 315–316 (4th Cir. 1968), affg. 46 T.C. 796 (1966). As has been said in earlier cases, the Commissioner's use of the estate tax tables in valuing the annuity in this case is presumptively correct, and the petitioners have the burden of proving that the use of such tables was arbitrary and unreasonable. *Dix v. Commissioner, supra; Estate of Bell v. Commissioner, supra.* The petitioners have presented no evidence to demonstrate that the longer life expectancy of commercial annuitants should be attributed to Mr. and Mrs. Schultz. For this reason, *Dunigan v. United States,* 434 F.2d 892 (5th Cir. 1970), relied upon by the petitioners, is distinguishable. Moreover, the petitioners' bare allegation that the tables used by the Commissioner are obsolete is not sufficient to support a finding that the use of such tables was arbitrary and unreasonable. *Dix v. Commissioner, supra; Estate of Bell v. Commissioner, supra.*

The petitioners also argue that since they relied upon Rev. Rul. 62–137, *supra,* in arranging for the exchange of the properties for the annuity, they should be allowed to use the commercial tables, even though the Court decides that the estate tax tables are more appropriate. However, such ruling states that annuity contracts issued by corporations which enter into annuity contracts "from time to time," but which are not commercial life insurance companies, may be valued as commercial annuity contracts. In *Dix v. Commissioner, supra,* the Court pointed out that the ruling by its terms applied only to corporations which entered into annuity contracts "from time to time." The Court found that the ruling was applicable only to those corporations which wrote enough annuity contracts to obtain a good spread of the actuarial risk. 392 F.2d at 316. Clearly, that is not the case here. Therefore, we find that the petitioners were not justified in relying upon Rev. Rul. 62–137, *supra,* and we sustain the Commissioner's determination that the value of the annuity was $169,603.56.

In this record, there are several indications of the fair market value of the 18th Street property and the 12th Street property, and they suggest widely different results. The term "fair market value" generally is defined as the price at which

property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both being reasonably informed as to all relevant facts. *Alvary v. United States,* 302 F.2d 790, 794 (2d Cir. 1962); *Estate of Guggenheim v. Commissioner,* 39 B.T.A. 251, 292 (1939), modified 117 F.2d 469 (2d Cir. 1941), cert. denied 314 U.S. 621 (1941); see also sec. 1.170–1(c), Income Tax Regs.; sec. 20.2031–1(b), Estate Tax Regs.; sec. 25.2512–1, Gift Tax Regs.

The petitioners argue that the parties agreed upon a value of $225,000 for the properties and that this Court is bound to respect the value contractually agreed upon by the parties and fixed by them as the selling price of the properties. *Commissioner v. Patino,* 186 F.2d 962, 967 (4th Cir. 1950), affg. 13 T.C. 816 (1949); *Evans v. Rothensies,* 114 F.2d 958, 962 (3d Cir. 1940); *Commissioner v. John C. Moore Corp.,* 42 F.2d 186, 188 (2d Cir. 1930), affg. 15 B.T.A. 1140 (1929). However, this principle is applicable only if the parties are dealing at arm's length, and there is no reason to question the bona fides of the transaction or the value fixed by the parties. *Commissioner v. Patino, supra* at 967.

In this case, the selling price of the larger of the two properties, the 18th Street property, clearly was not fixed as a result of arm's-length bargaining between the parties. In fact, there was no bargaining whatsoever with respect to price; the selling price was determined unilaterally by Mr. Schultz. Robert, Harold, and Jerome made no attempt to ascertain, through real estate appraisals or otherwise, the fair market value of the property. The selling price was immaterial to Robert, Harold, and Jerome as long as the rentals from Schultz Co. were sufficient to fund the annuity. From their point of view, the acquisition of the properties was a no-risk investment. Under these circumstances, we cannot accept the contractually agreed upon selling price as determinative.

In his notice of deficiency, the Commissioner based his valuation of the 18th Street property and the 12th Street property on the value of the annuity given in exchange for such properties, that is, $169,603.56. In his amendment to the answer, he adopted the average of the values determined by Mr. Ruth and Mr. Eckert. He has the burden of proving such lower valuations. Rule 142(a), Tax Court Rules of Practice and Procedure.

In his written report, Mr. Ruth assigned a value of $95,000 to the 18th Street property and $22,000 to the 12th Street property. Mr. Eckert was of the opinion that the value of the 18th Street property was $110,000 and that the value of the 12th Street property was $22,000. In valuing the 18th Street property, Mr. Ruth made a projection of the income to be earned by such property and estimated that the gross annual rental would be $40,000. Mr. Eckert used the income capitalization method in valuing both properties, and he anticipated that the gross annual rental would be $33,700 from the 18th Street property and $3,250 from the 12th Street property. Both appraisers assumed that the property would be vacant and, therefore, included a discount for expected vacancy; they also discounted the income for the costs of repair and maintenance. Since the appraisers were unaware of the Schultz Co. lease and failed to take it into consideration in arriving at the values set forth in their written reports, those opinions are obviously not reliable.

Nor are their revised valuations presented at the trial altogether persuasive. At the trial, Mr. Ruth concluded that in light of the Schultz Co. lease, the value of the 18th Street property was $205,000. Because of such lease, Mr. Eckert increased his valuations to $204,600 for the 18th Street property and $23,600 for the 12th Street property. However, in arriving at the higher valuations, the appraisers reduced the vacancy factor and eliminated the reduction for the costs of repair and maintenance, but they continued to use the same estimates as to the annual rentals to be derived from the properties, which estimates were in fact substantially in excess of the rentals provided by the Schultz Co. lease. Thus, in effect, they took into consideration some of the actual facts, but not all of them. In addition, Mr. Ruth increased his valuation of the 12th Street property to $35,000, but the increase was based on his assertion that the property was sold for a substantially larger price in 1969. In fact, the evidence indicates that the property was not sold in 1969.

After weighing the several opinions of the value of the two properties, we are convinced that the lower valuations are too low and that the higher valuations are too high. The fact that the properties were exchanged for an annuity having a value of

$169,603.56 furnishes some evidence that the properties were also equal to such value.[8] *United States v. Davis,* 370 U.S. 65, 72–73 (1962). In our judgment, it seems that such amount constitutes a reasonable and appropriate value for the 18th Street and 12th Street properties. Accordingly, we find and hold that the investment in the contract was $169,603.56.

Since we have found that the value of the annuity given in exchange for the 18th Street and 12th Street properties was $169,603.56, it follows that Mr. and Mrs. Schultz realized a gain of $87,082.99 as a result of such transaction, the difference between the value of the annuity and their basis in the properties. The parties disagree with respect to the manner of reporting the resulting gain. This Court likewise considered the same question in the *Bell* case.

In *Estate of Bell v. Commissioner, supra,* the taxpayers transferred stock to their children in exchange for the transferees' agreement to pay them an annuity. The stock was placed in escrow as security for the payment of the annuity. In the event of a default, the agreement provided for a cognovit judgment against the transferees. The Court found that the agreement was amply secured. The transferors' basis in the stock was less than the value of the annuity. The Court thereupon found that the resulting gain was taxable as income in the year of the transfer.

The facts in the case before us are not materially different. The annuity in question was secured both by the real property and the obligation of the lessee to pay rentals on account thereof. The property could not be sold without the consent of the annuitants. The agreement embodied a confession-of-judgment clause.

An annuity contract such as is involved in this case is "property." We are not dealing with a mere unsecured promise to pay a specific amount. In fact, the Court has resorted to the value of the annuity in order to determine the value of the property received in exchange. We thus have a transfer of property (real estate) for other property (an annuity) where the value of the property received exceeds the transferors' basis for the property transferred. Following our opinion in *Estate of Bell*

---

[8]The Commissioner has not asserted that the substance of the transaction was a transfer of the properties with a reserved life estate in the income therefrom, rather than a sale in consideration for an annuity. Compare *Lazarus v. Commissioner,* 513 F.2d 824 (9th Cir. 1975), affg. 58 T.C. 854 (1972).

*v. Commissioner, supra,* the exchange represents a "closed transaction" and the resulting gain is taxable in the year of exchange.

Our finding that the value of the annuity was $169,603.56 also establishes the cost basis to 212 Corp. of the two properties. We have also found that the aggregate value of the properties was equal to such amount, but it is now necessary to determine the value of each property. There was little difference of opinion as to the value of the 12th Street property, and after reviewing the evidence, we find its value to be $24,000. The remainder, $145,603.56, is allocable to the 18th Street property. As the improvements and land were purchased for a lump sum, the basis must be further allocated between the depreciable and nondepreciable properties according to their respective fair market values at the time of acquisition. Sec. 1.167(a)–2 and (a)–5, Income Tax Regs. Unfortunately, the parties have devoted little attention to the issue of a proper allocation in their briefs.

It is clear from the experts' reports that the value of the two properties was derived in large measure from the improvements thereon, the underlying land being of only minimal value. Accordingly, we hold that the depreciable cost basis to 212 Corp. of the building on the 12th Street property is $20,000, and that the depreciable cost basis of the building on the 18th Street property is $95,000. The amount to be allocated to the blacktop and fence on the 18th Street property poses a more difficult question. On its Federal income tax returns, 212 Corp. allocated $33,200 to such improvements. The two experts varied widely in their appraisals of such improvements; Mr. Eckert determined the value to be $12,328, whereas Mr. Ruth determined the value to be $2,473. The original cost of such improvements to Mr. Schultz was approximately $50,000. Using our best judgment, we allocated $15,000 of the cost of the 18th Street property to the blacktop and fence.

The parties are in agreement that the blacktop and fence on the 18th Street property had a remaining useful life of 15 years. However, they disagree as to the remaining useful lives of the two buildings. On its income tax returns, 212 Corp. claimed that the building on the 18th Street property had a remaining useful life (as of 1968) of 12.5 years. However, Mr. Eckert in his report estimated that the remaining useful life of the building was 20 years. Moreover, it is clear that 212 Corp. anticipated being able

to lease the building for more than 12.5 years, since the lease it executed granted the lessee three independent 5-year options to renew at the end of the preceding term. Furthermore, as the only income available to 212 Corp. to meet its annuity obligation was the rentals from the property, it must have anticipated that the remaining useful life of the building was at least 16.2 years, the joint life expectancy of Mr. and Mrs. Schultz. In addition, on the original plan submitted to Mr. Schultz, the CPA stated that he considered the building to have a remaining useful life of 20 years. Accordingly, we find that the building on the 18th Street property had a remaining useful life, as of 1968, of 20 years.

On its income tax returns, 212 Corp. claimed that the building on the 12th Street property had a remaining useful life of 20 years. The Commissioner contends that the remaining useful life was 50 years, based upon the estimate in Mr. Eckert's report. From his report, it appears that Mr. Eckert's estimate was based in part upon his determination that the building, due to its excellent location, would suffer no economic obsolescence. 212 Corp. presented no evidence as to the remaining useful life of the building. Under the circumstances, we find that the remaining useful life of the building on the 12th Street property was 50 years.

To reflect our conclusions herein,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

Fay, *J.*, dissenting: I respectfully dissent from the majority's conclusion that petitioners, under the facts of this case, must report gain in 1968 upon the transfer by them of certain real property for the promise to pay an annuity. Specifically, I believe the opinion is erroneous in its determination that the annuity in this case has an ascertainable fair market value.

As a general rule, section 1001 requires the recognition of any gain or loss realized upon the sale or other disposition of property. In this context, the gain realized, and thus reportable, is the amount by which "the sum of any money plus the fair market value of the property (other than money) received"

exceeds the adjusted basis of the property transferred. If that which is received has no ascertainable fair market value,[1] the transaction is held "open" and the taxpayer is permitted to first recover his basis in the transferred property before recognizing any gain.

In the instant case, petitioners transferred certain real property in exchange for 212 Corp.'s promise to pay an annuity. Before the measure of petitioners' realized gain, if any, and the year it is reportable, can be ascertained, it is necessary to first determine the fair market value of 212 Corp.'s promise to pay. The Third Circuit, to which this case is appealable, has previously addressed this question.

In *Evans v. Rothensies*, 114 F.2d 958 (3d Cir. 1940), the taxpayer, Evans, transferred 3,000 shares of preferred stock to his son-in-law, Adams, for $84,000. The purchase price was payable in semiannual installments in the form of an annuity for the life of Evans and his wife. Under the annuity agreement, 2,956 of the 3,000 shares transferred were placed in an escrow account as security for the annuity payments due. The preferred stock contained certain dividend requirements from which the annual payments to Evans would be made. Specifically, the annual dividends on the stock exceeded the annuity payments by $3,000 to $9,500. Further, except for the dividends paid on the stock, Adams was without the means to make the annuity payments. Evans sought to deduct as a loss the difference between his basis in the stock transferred and what he believed to be the fair market value of the annuity. In disallowing the claimed loss, the court specifically found that the annuity had no ascertainable fair market value. In so doing, it noted that an annuity contained certain elements of value which were incapable of appraisal, viz, security, assurance of income, regularity of payments, and relief of responsibility attending to investment. The court further stated:

whether Evans would ever receive any annuity payments under the contract with Adams depended in a very real sense upon whether the company continued to earn and pay dividends wherewith Adams could make the payments called for by the annuity. Unless Adams was so enabled to pay, Evans' right of redress for a default by Adams in annuity payments was definitely limited by the contract to such satisfaction as was obtainable

---

[1] Sec. 1.1001–1(a), Income Tax Regs., provides in part that "only in rare and extraordinary cases will property be considered to have no fair market value."

through the security of the escrowed stock. Particularly, in these circumstances, the contract of annuity could not be said to have a fair market value * * * [114 F.2d at 962.]

Although the facts in *Evans* differ slightly from those of the present case, certainly the relevant factors upon which the court based its decision are not sufficiently distinguishable to warrant a different conclusion respecting the fair market value of the annuity.[2]

In the instant case, petitioners transferred property to a corporation owned by their sons in return for the corporation's promise to pay an annuity. *As in Evans*, the property transferred was *security* for the transferee's promise to pay. *As in Evans*, the income generated by the property transferred was to be the source of the annuity payments. Further, *as in Evans*, except for the income from the transferred property, the transferee would be unable to make the annuity payments. Moreover, *as in Evans*, whether petitioners would ever receive any annuity payments depended upon the continued success of a corporation—in this case, Schultz Co.[3] Despite the cognovit clause, petitioners' only redress in the event 212 Corp. did not pay was, *as in Evans*, limited to such satisfaction as was obtainable through the property transferred. In addition, *as in Evans*, the value of the security was also directly related to the success of a corporation.[4]

When the above factors are coupled with the additional uncertainty of each annuitant's lifespan, under the Third Circuit's approach, I would hold that the annuity received by petitioners has no ascertainable fair market value.[5]

Under a finding that the annuity had no ascertainable fair

---

[2]The Third Circuit in *Evans v. Rothensies*, 114 F.2d 958 (3d Cir. 1940), held that the annuity received by the taxpayer had no ascertainable fair market value for purposes of determining whether he sustained a *loss* on the transferred stock. In our case, the issue involves the realization of a *gain* on the transferred property.

However, whether the issue involves the realization of a gain or a loss on the transaction does not affect the question of whether the annuity promise has an ascertainable fair market value. *Commissioner v. Kann's Estate*, 174 F.2d 357 (3d Cir. 1949).

[3]Specifically, the rent received by 212 Corp. and used to pay the annuity was dependent upon Schultz Co.'s success.

[4]The facts indicate that without Schultz Co. as a tenant the fair market value of the transferred property dropped significantly.

[5]Moreover, I believe the majority's use of actuarial tables to establish the fair market value of petitioners' annuity is questionable at best. The concept of "fair market value" has been oft-defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Although there are no findings as to what a "willing buyer" (indeed, if one could even be found)

market value, the payments received by petitioners would consist of two components for tax purposes. At the outset, a portion of each payment would be ordinary income under section 72 and the balance would constitute a recovery of petitioners' basis in the property transferred. Once petitioners had fully recovered their basis, any payments received thereafter would also consist of two components. Specifically, a portion would be ordinary income under section 72 and the remainder would be capital gain. Before the ordinary income portion under section 72 can be computed, it is necessary to determine petitioners' investment in the contract under section 72(c).[6] In this respect, I would agree with the majority's determination. In so doing, however, I must necessarily express my disagreement with the following statement made in the *Estate of Bell v. Commissioner*, 60 T.C. 469, 476 (1973):

It would be manifestly inconsistent to find that the annuity contract had a fair market value for purposes of determining a taxpayer's cost or investment in the contract under section 72(c), and yet to hold it had no determinable value for purposes of section 1001.

In *Burnet v. Logan*, 283 U.S. 404 (1931), the Supreme Court recognized that a contingent right to receive payments could have a fair market value for one purpose and yet not have a fair market value for another purpose. Thus, I do not believe it to be beyond the pale to find an annuity has a fair market value for purposes of section 72(c), and at the same time find that it has no fair market value for purposes of section 1001. Suffice it to say the sections are not concerned with the same matters.[7] See also *Estate of Hurlburt v. Commissioner*, 25 T.C. 1286 (1956).

---

would have paid petitioners for their annuity, it is highly unlikely that they could have obtained a price even close to the $169,000 figure which the majority found as the fair market value.

[6]Under sec. 72(c) the investment in the contract is basically the cost of the contract to the annuitant. However, where the parties are related *and* there is no evidence to show that they were dealing at arm's length, the possibility of a partial gift on the transfer of the property exists. It is therefore necessary to look elsewhere to determine the investment in the contract. For this purpose, the majority used the annuity tables under sec. 20.2031–7(f), Estate Tax Regs.

[7]I also disagree with the majority's use of its determination of the fair market value of the annuity under sec. 20.2031–7(f), Estate Tax Regs., as evidence of the fair market value of the real property exchanged therefor. The use of this method in cases of this type was explicitly rejected by the Third Circuit in *Evans v. Rothensies, supra*.

Furthermore, as support for its conclusion in this determination, the majority cites *United States v. Davis*, 370 U.S. 65 (1962). The pertinent portion of that case was predicated on the fact that the parties were dealing at arm's length. The majority specifically found that not to be the case herein. *Davis* simply is inapposite. Under our facts, with all the inherent uncertainties embodied in sec. 20.2031–7(f), Estate Tax Regs., if the value of the annuity determined thereunder were equal to the

Finally, even if 212 Corp.'s promise to pay could be considered as having an ascertainable fair market value, the majority fails to discuss whether such promise also constitutes the equivalent of cash.

Under the accounting rules which have developed, a cash basis taxpayer is required to report income upon the receipt of cash or the equivalent of cash. If a taxpayer receives a deferred payment obligation which is not considered the equivalent of cash, then recognition of income is postponed until payments on the obligation are received. *Western Oaks Building Corp. v. Commissioner*, 49 T.C. 365 (1968). As previously stated, section 1001 generally requires the recognition of all gains realized upon the sale of property. In computing any gain on the sale, the "amount realized" includes any cash plus the fair market value of other property received by the vendor. If the property received has no ascertainable fair market value, the transaction is held "open" and the recognition of gain is deferred.[8] *Estate of Hurlburt v. Commissioner, supra.* Normally, the accounting rules and the rules under section 1001 operate in tandem. That is to say, the conclusion which usually follows from a finding that a promise to pay is not the "equivalent of cash" (and thus not reportable under the accounting rules) is that such promise has no ascertainable fair market value, and therefore does not constitute an "amount realized" under section 1001. *Johnston v. Commissioner*, 14 T.C. 560 (1950). However, a potential conflict between the accounting rules and the rules under section 1001 arises when a vendor receives a promise to pay which has an ascertainable fair market value but which has characteristics of a promise which is not the equivalent of cash. The question then is which set of rules govern the reporting of the transaction.[9]

In *Warren Jones Co. v. Commissioner*, 60 T.C. 663 (1973), revd. 524 F.2d 788 (9th Cir. 1975), the taxpayer sold for $153,000 certain real property with an adjusted basis of about $62,000, thereby realizing a gain on the sale of $91,000. Under the terms of the sale, the taxpayer received a cash downpayment of

---

value of two parcels of income-producing real property, it would be nothing more than pure coincidence.

[8] This assumes no valid installment sales election is made pursuant to sec. 453. See sec. 1001(d).

[9] Essentially, the question is whether "fair market value" and "cash equivalence" are interchangeable terms for purposes of computing gain under sec. 1001. See *MacDonald v. Commissioner*, 55 T.C. 840, 860–861 (1971). Stated otherwise, is a promise to pay which has a fair market value necessarily the equivalent of cash?

$20,000 and a deferred payment obligation with a face value of $133,000 and a fair market value of approximately $77,000. To be decided was the manner in which the gain was to be reported. In holding for the taxpayer, we concluded that notwithstanding the fact that the obligation had an ascertainable fair market value, it nevertheless was not the equivalent of cash and as such did not constitute an "amount realized" in the year of sale.[10] Under this analysis, the transaction was held "open" thereby permitting the taxpayer to recover its basis before the recognition of any gain. On appeal, the Ninth Circuit reversed and held that if a deferred-payment obligation has an ascertainable fair market value then, unless installment reporting is elected, the transaction is "closed" for reporting purposes, and the taxpayer must report any gain in the year of the sale.[11]

In the instant case, petitioners received a promise to pay which the majority has determined had an ascertainable fair market value. Under the rationale of our decision in *Warren Jones*, in determining whether petitioners are obligated to report any gain in the year of sale, our inquiry does not end at this juncture. In other words, we must further determine whether the payment obligation received by petitioners constituted the equivalent of cash. Under the facts, it would appear that it does not. In this connection, the promise received by petitioners was nonassignable,[12] and was by its very nature not the type of obligation which would "commonly change hands in commerce." *Western Oaks Building Corp. v. Commissioner*, 49 T.C. 365 (1968); *Johnston v. Commissioner, supra; Ennis v.*

---

[10]The finding of no cash equivalence was premised on the fact that the obligation could only be marketed at a discount greater than 40 percent of its face value.

[11]Presumably, under the Ninth Circuit's approach, the taxpayer would likewise have to recognize a loss if its adjusted basis exceeded the "amount realized." For example, if the taxpayer in *Warren Jones Co. v. Commissioner*, 60 T.C. 663 (1973), revd. 524 F.2d 788 (9th Cir. 1975), had a basis in the transferred property of $100,000, absent sec. 453, it would have had a recognizable loss of $3,000 in the year of sale ($100,000 basis less $97,000 cash plus fair market value of note received). This result would follow notwithstanding the fact that the property was sold at a gain of $53,000 ($153,000 sales price less $100,000 basis).

Furthermore, since the transaction is closed in the year of the sale, any amounts subsequently collected by the taxpayer in excess of the obligation's fair market value would apparently constitute ordinary income. See *Osenbach v. Commissioner*, 17 T.C. 797 (1951), affd. 198 F.2d 235 (4th Cir. 1952). However, in light of the decision in *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952), and the cases which have emanated therefrom, the result in *Osenbach* appears questionable. See *Federal Bulk Carriers, Inc. v. Commissioner*, 66 T.C. 283 (1976), affd. 558 F.2d 128 (2d Cir. 1977).

[12]Although it does not appear in the majority's factual findings, the record shows that the contract of payment received by petitioners was nonassignable. On this point, see Rev. Rul. 68–606, 1968–2 C.B. 42.

*Commissioner,* 17 T.C. 465 (1951). Under these circumstances, to be consistent with our holding in *Warren Jones,* petitioners should be permitted to report any gain realized by them under the cost recovery method.

If, by its holding herein, the majority intends to reject the approach set forth in our decision in *Warren Jones,* it should do so expressly. As it is now, without a significant policy justification therefor,[13] I believe this case and our decision in *Warren Jones* are theoretically and regrettably irreconcilable.

SIMPSON, *J.,* dissenting: The doctrine of stare decisis assures stability and equality of treatment—laudable objectives in our legal system. However, when a ruling of the Court is unsound, there is no merit in assuring taxpayers that such ruling will continue to be applied or that it will be applied to all taxpayers equally. This Court has recognized that when it becomes convinced that one of its decisions is unsound, it has the capacity to correct its mistakes. *Focht v. Commissioner,* 68 T.C. 223 (1977); *Sylvan v. Commissioner,* 65 T.C. 548 (1975). When I weigh the advantages of applying stare decisis and continuing to follow our decision in *Estate of Bell v. Commissioner,* 60 T.C. 469 (1973), against the consequences of holding that the entire gain is recognized in the year in which property is exchanged for a private annuity, I am of the view that we should reconsider and reverse our holding in *Bell.* For that reason, I must dissent.

Section 1001(a) provides that "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis * * * for determining gain," and section 1001(b) provides "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Whether the receipt of a promise to make future payments of money has a fair market value for such purposes has been a troublesome question. Over the years, it has been the position of this Court that the fair market value

---

[13]Admittedly, private annuity transactions differ from typical sale transactions in that in the former situation the total price to be paid is contingent on the annuitant's survival. However, this factual distinction does not warrant a change in the applicable law. Rather, I believe the contingent nature of the sales price is merely a factor to be considered in determining whether the obligation has an ascertainable fair market value.

of an obligation is realized by a taxpayer using the cash method of accounting only if such obligation is the equivalent of cash, and that "In determining what obligations are the 'equivalent of cash' the requirement has always been that the obligation, like money, be freely and easily negotiable so that it readily passes from hand to hand in commerce." *Ennis v. Commissioner*, 17 T.C. 465, 470 (1951). See *Western Oaks Building Corp. v. Commissioner*, 49 T.C. 365 (1968); *Estate of Ennis v. Commissioner*, 23 T.C. 799 (1955); *Johnston v. Commissioner*, 14 T.C. 560 (1950). In *Warren Jones Co. v. Commissioner*, 60 T.C. 663 (1973), the seller of property received a contract calling for future payments of money in satisfaction thereof. The Court found that such contract was transferable and had an ascertainable fair market value. However, to have made such a transfer, the seller would have been required to accept a discount of almost 50 percent. This Court concluded that when a discount of such magnitude is required, the obligation is not the equivalent of cash. On the other hand, when the *Warren Jones Co.* case was appealed to the Ninth Circuit (524 F.2d 788 (1975)), that court concluded that since the contract was transferable and since its fair market value was ascertainable, such value constituted an amount realized within the meaning of section 1001(b).

Before our decision in *Estate of Bell v. Commissioner, supra*, it was the position of this Court that when property was exchanged for an unsecured private annuity, the amount to be received by the annuitant could not be ascertained, and therefore, the actuarial value of the annuity was not required to be treated as an amount realized at the time of the exchange. *Deering v. Commissioner*, 40 B.T.A. 984 (1939); *Lloyd v. Commissioner*, 33 B.T.A. 903 (1936). *Bell* reversed that position; the Court said:

It would be manifestly inconsistent to find that the annuity contract had a fair market value for purposes of determining a taxpayer's cost or investment in the contract under section 72(c), and yet to hold it had no determinable value for purposes of section 1001. [60 T.C. at 476.]

The Court also pointed out that the annuity promise was secured in that case.

In deciding how to treat private annuities under section 1001, we should, in my opinion, recognize that the annuity constitutes a peculiar type of obligation. Both in *Bell* and in the case before us, the promise to pay the annuity was secured, and for that

reason, it is appropriate to deny the annuitant the privilege of recovering his basis before reporting any gain; it is appropriate to require him to begin to report some part of the gain as he receives the annuity payments. On the other hand, there is no certainty as to how much he will receive under the annuity arrangement or how much of the gian he will ultimately realize. In this case, the expected return on the annuity contract was actuarially computed to be $295,548.26; yet, 212 Corp. had no obligation to pay such amount. In fact, it was almost certain that the annuitants would receive more or less than that amount. At the time the Schultzes commenced to receive the annuity payments, there was no certainty that they would even receive payments in excess of their basis in the property.

Prior to 1954, Congress adopted a 3-percent formula in taxing annuities; annuity payments were included in gross income to the extent of 3 percent of the amount paid for the annuity. Any amounts received by the annuitant in excess of the 3 percent were considered to be the return of the annuitant's capital and were excluded from gross income until the total amount excluded equaled the amount paid for the annuity.[1] After the annuitant had recovered the amount paid for the annuity, the entire annuity payments were includable in gross income.

Under pre–1954 law, an annuitant who transferred appreciated property for an annuity recovered his basis in the property in the same manner as an annuitant who transferred cash in exchange for an annuity recovered his capital investment. Thus, annuity payments were included in gross income to the extent of 3 percent of the consideration paid for the annuity (the fair market value of the property transferred). The remainder was excluded from gross income until the total amount excluded equaled the annuitant's adjusted basis in the property transferred. Subsequent payments, to the extent they exceeded 3 percent of the fair market value of the property transferred, were taxable as gain from the sale of such property, until the

---

[1]Sec. 22(b)(2), I.R.C. 1939, provided in relevant part as follows:

Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this chapter or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. * * *

total of the payments so taxed equaled the gain. Thereafter, the payments were includable in full in gross income. *Hill's Estate v. Maloney,* 58 F. Supp. 164, 174–175 (D. N.J. 1944); Rev. Rul. 239, 1953–2 C.B. 53.

In 1954, Congress eliminated the 3-percent rule, which had been criticized as erratic:

the annuitant finds that after being retired for a few years and becoming accustomed to living on a certain amount of income after tax, he suddenly has to make a sizeable downward adjustment in his living standard because, when his exclusion is used up, the annuity income becomes fully taxable. [S. Rept. 1622, 83d Cong., 2d Sess. 11 (1954).]

Congress sought to eliminate this problem by enacting section 72, under which there is a proration of the cost of the annuity. A portion of each annuity payment is treated as a return of the annuitant's cost (his "investment in the contract") and is excluded from gross income; the remainder is treated as interest on the taxpayer's investment.

When property is exchanged for a secured private annuity, it seems that under section 72, the gain should be prorated in a similar manner. Just as Congress decided that the recovery of the investment in the contract should be prorated in order to even out the tax consequences of receiving an annuity, it seems that the taxation of the gain should also be prorated for the same reason. By prorating the gain, the taxpayer is not required to report the entire gain in a single year; nor is he permitted to exclude the portions of the annuity payments attributable to the investment in the contract for some years and then become taxable wholly on such portions of the payments.

The suggested proration of the gain has been adopted by the Treasury regulations as the treatment for nonassignable[2] annuities issued by charitable organizations. Section 1.1011–2(c), Income Tax Regs., in example (*8*)(c), provides that in the case of a bargain sale of appreciated property to a charitable organization in exchange for an annuity, the capital gain is to be reported ratably over the life expectancy of the annuitant. The capital gain is reportable out of that portion of the annual payments which constitutes a return of the annuitant's investment in the contract under section 72. Annuities issued by

---

[2]The annuity in the case before us was not assignable.

charitable organizations generally are considered sufficiently comparable to annuity contracts issued by commercial insurance companies so as to justify the application of the same standard of valuation to both. Rev. Rul. 62–137, 1962–2 C.B. 28; *Raymond v. Commissioner*, 40 B.T.A. 244 (1939), affd. 114 F.2d 140 (7th Cir. 1940), cert. denied 311 U.S. 710 (1940). It is difficult to justify a finding that a taxpayer who exchanges property for a private annuity (albeit a secured one) must report his entire capital gain in the year of the exchange, even though under the regulations, a taxpayer who exchanges property for a semicommercial annuity is entitled to report the gain ratably over his life expectancy.

In conclusion, this case presents an unusual situation: In *Bell* and in this case, the Court embraces a rule not sought by either party. In this case, the Commissioner did ultimately support the position of *Bell,* but he expressly stated that he was doing so to protect the revenue; it is clear that as a matter of principle, even he recognizes that such a rule is not advisable. Under these circumstances, it is clear to me that we should reconsider our position in *Bell* and adopt a different position.

DAWSON, TANNENWALD, WILES, and WILBUR, *JJ.,* agree with this dissenting opinion.